ORAL ARGUMENT NOT YET SCHEDULED

**Nos. 23-1041, 23-1127 (consolidated)**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PACIFIC GAS AND ELECTRIC COMPANY,
Petitioner

v.

FEDERAL ENERGY REGULATORY COMMISSION,
Respondent

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

**BRIEF OF PETITIONER PACIFIC GAS AND ELECTRIC COMPANY**

Joshua S Levenberg
Alexandra J. Ward
PACIFIC GAS AND ELECTRIC COMPANY
300 Lakeside Dr.
Oakland, CA 94612
(415) 973-5970
Joshua.Levenberg@pge.com
Ali.Ward@pge.com

Elaine J. Goldenberg
Helen E. White
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
 Suite 500E
Washington, DC 20001-5369
(202) 220-1100
Elaine.Goldenberg@mto.com

Henry Weissmann
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
(213) 683-9100
Henry.Weissmann@mto.com

*Counsel for Petitioner*

August 29, 2023

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and amici

Petitioner is Pacific Gas and Electric Company.  Respondent is the Federal Energy Regulatory Commission.  Intervenor for respondent is the City and County of San Francisco.  There are currently no amici in this case.

### B.    Rulings under review

The rulings under review are the following orders:

1. *City & Cnty. of San Francisco v. Pac. Gas & Elec. Co.*, Order on Remand, Docket Nos. EL15-3-004; ER15-704-026, 181 FERC ¶ 61,036 (Oct. 20, 2022), found at JA__-__;

2. *City & Cty. of San Francisco v. Pac. Gas & Elec. Co.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket Nos. EL15-3-005; ER15-704-027, 181 FERC ¶ 62,198 (Dec. 22, 2022), found at JA__-__; and

3. *City & Cnty. of San Francisco v. Pac. Gas & Elec. Co.*, Order Denying Request for Reconsideration and Addressing Arguments Raised on Rehearing, Docket Nos. EL15-3-005; ER15-704-027, 182 FERC ¶ 61,167 (Mar. 16, 2023), found at JA__-__.

## C.     Related cases

Other than these consolidated petitions for review (Nos. 23-1041, 23-1127), counsel for petitioner are unaware of any other related cases pending before this or any other Court.

In *City & County of San Francisco v. FERC*, 24 F.4th 652 (D.C. Cir. 2022), this Court reviewed earlier orders issued in the same underlying agency proceedings from which the orders at issue here arise.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Circuit Rule 26.1, Pacific Gas and Electric Company ("PG&E") submits the following disclosure statement.

PG&E is a public utility operating in northern and central California. PG&E is engaged primarily in natural gas procurement, transportation, and storage and in electricity generation, transmission, and distribution.

PG&E is a subsidiary of PG&E Corporation, a publicly held corporation that has a 10 percent or greater ownership interest in PG&E.

Dated:  August 29, 2023                    */s/ Elaine J. Goldenberg*
                                            Elaine J. Goldenberg

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF CONTENTS...................................................................iv

TABLE OF AUTHORITIES ................................................................vi

GLOSSARY OF ABBREVIATIONS ................................................. xiii

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF ISSUES ...............................................................4

STATUTES AND REGULATIONS.....................................................4

STATEMENT OF CASE .................................................................4

     1.    Energy Policy Act of 1992 ..................................................4

     2.    San Francisco's power supply system and PG&E's tariff ..................7

     3.    Dispute between San Francisco and PG&E ..........................................9

          a.    Initial Commission proceedings ..........................................9

          b.    This Court's decision ..................................................12

          c.    Commission proceedings on remand .......................................13

STANDARD OF REVIEW ...............................................................18

SUMMARY OF ARGUMENT ..........................................................18

STANDING ..................................................................................21

ARGUMENT ..................................................................................21

I.    The Orders Rest On An Incorrect Interpretation of Section 824k(h)(2) .......21

    A.    Section 824k(h)(2) Bars The Commission's Class-Based Approach ...................................................................................22

          1.    The Commission's class-based approach is irreconcilable with the statute's plain text .......................................22

          2.    The statutory context strongly confirms that Section 824k(h)(2) bars the Commission's class-based approach ........26

**TABLE OF CONTENTS**
**(continued)**

**Page**

    3.    The Commission's class-based approach is directly contrary to the statute's purpose ...............................28

    4.    Legislative history belies the Commission's class-based approach ...................................................................35

B.    The Orders Do Not Advance Any Legitimate Justification For The Commission's Contrary View Of Section 824k(h)(2) ................37

    1.    The *Suffolk County* orders do not interpret the statutory text or set forth a reasonable reading .......................................38

    2.    The Orders on appeal do not interpret the statutory text or set forth a reasonable reading ...................................................43

    3.    The Commission's apparent belief that this Court's prior decision dictated the class-based approach is incorrect............45

C.    No Deference Is Warranted....................................................46

D.    Vacatur Is Necessary So That The Commission Can Interpret The Tariff With A Correct Understanding Of Section 824k(h)(2)...........................................................................49

II.    The Orders Are Arbitrary And Capricious ...................................................50

CONCLUSION ..........................................................................................56

CERTIFICATE OF COMPLIANCE ......................................................57

CERTIFICATE OF SERVICE ...............................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*AHA v. Becerra*,
  142 S. Ct. 1896 (2022) ......................................................................48

*Allina Health v. Price*,
  863 F.3d 937 (D.C. Cir. 2017)..........................................................27

*Am. Radio Relay League v. FCC*,
  524 F.3d 227 (D.C. Cir. 2008)..........................................................51

*ANR Storage v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018).........................................................55

*Automated Power Exch. v. FERC*,
  204 F.3d 1144 (D.C. Cir. 2000)...........................................................5

*Baldwin v. United States*,
  140 S. Ct. 690 (2020)........................................................................49

*Baltimore Gas & Elec. v. FERC*,
  954 F.3d 279 (D.C. Cir. 2020) .....................................................53, 55

*Banuelos v. Barr*,
  953 F.3d 1176 (10th Cir. 2020) ........................................................23

*BP West Coast Products v. FERC*,
  374 F.3d 1263 (D.C. Cir. 2004).....................................................34, 35

*Carpenters Indus. Council v. Zinke*,
  854 F.3d 1 (D.C. Cir. 2017)...............................................................21

*Chamber of Com. v. FEC*,
  76 F.3d 1234 (D.C. Cir. 1996)..........................................................47

*Chevron, U.S.A. v. Nat. Res. Def. Council*,
  467 U.S. 837 (1984)...........................................................20, 47, 49

\* Authorities on which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

\*_City & Cnty. of San Francisco v. FERC_,
 24 F.4th 652 (D.C. Cir. 2022).........................ii, 4, 7-13, 18, 30-31, 45-46, 54-56

_Clark v. Martinez_,
 543 U.S. 371 (2005)...........................................................................................37

_Cnty. of Los Angeles v. Shalala_,
 192 F.3d 1005 (D.C. Cir. 1999)........................................................................49

_Council for Urological Ints. v. Burwell_,
 790 F.3d 212 (D.C. Cir. 2015)..........................................................................49

_ExxonMobil Oil v. FERC_,
 487 F.3d 945 (D.C. Cir. 2007)..........................................................................35

_FERC v. Elec. Power Supply Ass'n_,
 577 U.S. 260 (2016)......................................................................................6, 29

_Genus Med. Techs. v. FDA_,
 994 F.3d 631 (D.C. Cir. 2021)..........................................................................27

_Gozlon-Peretz v. United States_,
 498 U.S. 395 (1991)...........................................................................................27

_Gundy v. United States_,
 139 S. Ct. 2116 (2019)......................................................................................29

_Honeywell v. United States_,
 661 F.2d 182 (Ct. Cl. 1981)..............................................................................30

_Interstate Fire & Cas. v. Roman Cath. Church_,
 761 F.3d 953 (9th Cir. 2014) ...........................................................................22

_Jacoby v. NLRB_,
 233 F.3d 611 (D.C. Cir. 2000)..........................................................................55

_Kisor v. Wilkie_,
 139 S. Ct. 2400 (2019)......................................................................................19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Little Sisters of the Poor v. Pennsylvania*,
   140 S. Ct. 2367 (2020)......................................................................27

*Louisiana Energy v. FERC*,
   141 F.3d 364 (D.C. Cir. 1998)...........................................................21

*McFadden v. United States*,
   576 U.S. 186 (2015)...................................................................23, 26

*New York v. FERC*,
   535 U.S. 1 (2002).................................................................................5

*Niz-Chavez v. Garland*,
   141 S. Ct. 1474 (2021)..................................................23, 25, 26, 48

*Oklahoma v. Castro-Huerta*,
   142 S. Ct. 2486 (2022).....................................................................41

*Old Dominion Elec. Coop. v. FERC*,
   518 F.3d 43 (D.C. Cir. 2008)............................................................21

*Omnipoint v. FCC*,
   78 F.3d 620 (D.C. Cir. 1996)...........................................................56

*Patel v. Garland*,
   142 S. Ct. 1614 (2022)...............................................................38, 41

*Pharm. Mfg. Rsch. v. FDA*,
   957 F.3d 254 (D.C. Cir. 2020).........................................................27

*Rapoport v. SEC*,
   682 F.3d 98 (D.C. Cir. 2012)...........................................................54

*Republic of Sudan v. Harrison*,
   139 S. Ct. 1048 (2019).....................................................................46

*Russello v. United States*,
   464 U.S. 16 (1983)...................................................................27, 28

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*San Francisco v. United Airlines*,
  616 F.2d 1063 (9th Cir. 1979) .............................................................8

*SAS Inst. v. Iancu*,
  138 S. Ct. 1348 (2018).......................................................................38

*SFPP v. FERC*,
  967 F.3d 788 (D.C. Cir. 2020)...........................................................56

*SoundExchange v. Muzak*,
  854 F.3d 713 (D.C. Cir. 2017)...........................................................30

*Sw. Power Pool v. FERC*,
  736 F.3d 994 (D.C. Cir. 2013)...........................................................54

*Starbuck v. San Francisco*,
  556 F.2d 450 (9th Cir. 1977) .............................................................8

*Town of Norwood v. FERC*,
  587 F.2d 1306 (D.C. Cir. 1978)...........................................................5

*TRW v. Andrews*,
  534 U.S. 19 (2001)............................................................................27

*U.S. Telecom Ass'n v. FCC*,
  227 F.3d 450 (D.C. Cir. 2000)...........................................................51

*United States v. Allan Drug*,
  357 F.2d 713 (10th Cir. 1966) ...........................................................30

*United States v. Black*,
  25 F.4th 766 (10th Cir. 2022) ............................................................23

*United States v. Hayes*,
  555 U.S. 415 (2009)...........................................................................25

*United States v. Hubbell*,
  167 F.3d 552 (D.C. Cir. 1999)....................................................32, 52

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Otunyo*,
    63 F.4th 948 (D.C. Cir. 2023)............................................................................25

*United States v. San Francisco*,
    310 U.S. 16 (1940)...........................................................................................8

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)..............................................................................24, 27, 38

*W. Deptford Energy v. FERC*,
    766 F.3d 10 (D.C. Cir. 2014)...........................................................................56

*Whitman v. Am. Trucking Ass'n*,
    531 U.S. 457 (2001).........................................................................................47

FEDERAL STATUTES

1 U.S.C. § 1 ...............................................................................................................25

5 U.S.C. § 706 ...........................................................................................................18

16 U.S.C. § 824e ..........................................................................................................3

16 U.S.C. § 824j.....................................................................................................5, 29

16 U.S.C. § 824k .........................................................................................................5

16 U.S.C. § 824k(a)-(c)..............................................................................................29

16 U.S.C. § 824k(h) ...............................................................................................6, 53

*16 U.S.C. § 824k(h)(1) .........................................................................................6, 29

*16 U.S.C. § 824k(h)(2) ................................................. 1, 4, 6, 9, 21, 29, 45, 50, 54

*16 U.S.C. § 824k(h)(2)(A)....................................................................................6, 28

*16 U.S.C. § 824k(h)(2)(B) ............................................. 6, 7, 16, 23, 28, 31, 32, 39

16 U.S.C. § 825*l*..........................................................................................................3

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

16 U.S.C. § 2621 ...............................................................................26, 28

Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 .................5, 6, 26

Raker Act of 1913, Pub. L. No. 63-41, 38 Stat. 242.................................7

**LEGISLATIVE MATERIALS**

138 Cong. Rec. 32,083 (Oct. 5, 1992) .....................................................35

138 Cong. Rec. 34,012 (Oct. 8, 1992) .....................................................36

138 Cong. Rec. 34,018 (Oct. 8, 1992) ..............................................35, 36

**REGULATORY AUTHORITIES**

*City of Palm Springs*,
76 FERC ¶ 61,127 (1996)....................................................................39

*\*Suffolk County Electrical Agency*,
77 FERC ¶ 61,355 (1996)....................................................................39

*\*Suffolk County Electrical Agency*,
96 FERC ¶ 61,349 (2001)....................................................................40

*Suffolk County Electrical Agency*,
102 FERC ¶ 63,037 (2003)..................................................................40

*\*Suffolk County Electrical Agency*,
108 FERC ¶ 61,173 (2004)..............................................................11, 41

169 FERC ¶ 61,128 (2019) ..............................................................11, 12

181 FERC ¶ 61,036 (Oct. 20, 2022) .......................................................3

181 FERC ¶ 62,198 (Dec. 22, 2022)..................................................3, 15

182 FERC ¶ 61,167 (Mar. 16, 2023) ......................................................3

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

OTHER AUTHORITIES

*Black's Law Dictionary* (11th ed. 2019)..........................................................7, 23, 24

*Black's Law Dictionary* (6th ed. 1990)....................................................................22

Cassandra Burke Robertson, *Bringing the Camel into the Tent: State
and Federal Power over Electricity Transmission*,
49 Clev. St. L. Rev. 71 (2001) ............................................................................29

https://www.merriam-webster.com/dictionary/consumer ......................................24

https://www.merriam-webster.com/dictionary/class ...............................................25

Jon R. Mostel, *Overview of Electric Industry Bypass Issues*,
37 Nat. Resources J. 141 (1997)......................................................................5, 29

*The Shape of Competition Under Title VII of the Energy Policy Act of
1992*, 47 Admin. L. Rev. 493 (1995).....................................................................30

# GLOSSARY OF ABBREVIATIONS

| A | Addendum of statutory and regulatory provisions |
|---|---|
| Act | Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 |
| ALJ | Administrative Law Judge |
| Commission | Federal Energy Regulatory Commission |
| FERC | Federal Energy Regulatory Commission |
| JA | Joint Appendix |
| PG&E | Pacific Gas and Electric Company |
| Rehearing Order | 182 FERC ¶ 61,167 (Mar. 16, 2023) |
| Order | 181 FERC ¶ 61,036 (Oct. 20, 2022) |
| Orders | collectively, the Order and the Rehearing Order |
| Tariff | PG&E's Wholesale Distribution Tariff |

# INTRODUCTION

On remand from this Court, the Federal Energy Regulatory Commission ("FERC" or "the Commission") relied on prior unreasoned Commission orders to interpret a statutory provision in a manner that disregards its plain text. That straightforward legal error requires vacatur.

This case involves a Pacific Gas and Electric Company ("PG&E") tariff that incorporates the criteria of a "grandfathering" exception found in 16 U.S.C. § 824k(h)(2). In that provision, Congress generally prohibited the Commission from ordering so-called "retail wheeling"—that is, from requiring a utility to transport another entity's power over the utility's own distribution lines and facilities directly to that entity's retail customer. But (as relevant here) Congress excluded from that prohibition certain arrangements that existed on the date of the provision's enactment. Accordingly, the Commission may order retail wheeling for the benefit of a state or federal entity that would sell the energy "directly to an ultimate consumer," but only if that entity "was providing electric service to such ultimate consumer on October 24, 1992." *Id*.

Here, San Francisco contended that virtually all of its points of delivery qualified for retail wheeling under the tariff pursuant to the grandfathering exception, and this Court remanded for the Commission to interpret the language of

the statute.[1]  Based on Commission orders from long ago that do not engage with Section 824k(h)(2)'s text, the Commission concluded that the exception covers not only any ultimate consumer to whom San Francisco was *actually* providing service on October 24, 1992, but also "*all potential* retail customers within the *class*" of consumers that San Francisco was serving on that date.  JA__ (Order ¶¶ 32-33) (emphasis added).  The Commission made clear that such a "class" includes "new" consumers that had no relationship with San Francisco on October 24, 1992, *id.*—and, indeed, even consumers that did not come into existence until after that date had passed.

That unreasonable interpretation cannot be reconciled with the statute's text, as confirmed by statutory context, congressional purpose, and legislative history. Section 824k(h)(2) says nothing about "classes" of consumers, and its grandfathering exception is unambiguous:  an entity like San Francisco must have provided service to "an ultimate consumer" at a specified point in the past in order for that same discrete, particular "ultimate consumer" to be eligible for grandfathering.  Moreover, expanding the grandfathering exception as the Commission did here makes that exception sweep so broadly as to effectively

---

[1] "San Francisco" refers to the City and County of San Francisco and its publicly owned electric utility, the San Francisco Public Utilities Commission.

swallow Congress's retail-wheeling prohibition—a result directly contrary to Congress's clear aims.

This Court need go no further to conclude that vacatur is warranted. But even if the Commission's class-based approach had merit (which it does not), the Commission's orders are nevertheless arbitrary and capricious: they provide no reasoned explanation of how to define a "class" for grandfathering purposes or of how to reconcile the class-based approach with other key tariff language.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 16 U.S.C. § 825*l*. FERC exercised jurisdiction under 16 U.S.C. § 824e. PG&E timely sought rehearing of FERC's order and petitioned for review of that order within 60 days of FERC deeming rehearing denied, and then petitioned for review of FERC's subsequent order explaining the reasons for denying rehearing within 60 days of that order's issuance. JA__ (181 FERC ¶ 61,036 (Oct. 20, 2022)) (initial order); JA__ (FERC eLibrary No. 20221121-5209, Docket Nos. EL15-3-005, ER15-704-027 (Nov. 21, 2022)) (rehearing request); JA__ (181 FERC ¶ 62,198 (Dec. 22, 2022)) (deeming rehearing denied); Pet., No. 23-1041 (Feb. 17, 2023); JA__ (182 FERC ¶ 61,167 (Mar. 16, 2023)) (addressing rehearing arguments); Pet., No. 23-1127 (May 8, 2023).

## STATEMENT OF ISSUES

1.  Whether the Commission's interpretation of 16 U.S.C. § 824k(h)(2), which formed the basis for the Commission's interpretation of the tariff at issue, is contrary to the statute or otherwise contrary to law.

2.  Whether the Commission's orders are arbitrary, capricious, and/or an abuse of discretion because the Commission adopted a "class-based" approach, did not adequately explain or justify how that approach is consistent with key tariff language, and did not adequately explain how to identify a "class."

## STATUTES AND REGULATIONS

Relevant provisions are set forth in the Addendum.

## STATEMENT OF CASE

**1.  *Energy Policy Act of 1992.*** Electricity moves from "generators to end users in two stages:  transmission and distribution." *City & Cnty. of San Francisco v. FERC*, 24 F.4th 652, 654-55 (D.C. Cir. 2022).  Transmission lines transport power "from generators across long distances," and that power ultimately "flows to consumers through distribution lines." *Id.*

A utility may generate energy at a location that is distant from its customers' locations.  If that utility does not own the lines and facilities needed to deliver its energy to those customers, the utility may use another utility's lines to transport its power.  The practice of using another party's lines and facilities to deliver power is

known as "wheeling."  In industry parlance, the utility that provides the lines and facilities to transport another entity's power is "wheeling" the power on behalf of the other entity.  *See Automated Power Exch. v. FERC*, 204 F.3d 1144, 1148 & n.3 (D.C. Cir. 2000); *Town of Norwood v. FERC*, 587 F.2d 1306, 1307 n.2 (D.C. Cir. 1978).

One type of wheeling is called "retail wheeling."  It occurs when the generating utility uses another utility's distribution lines and facilities to deliver (*i.e.*, to wheel) the power directly to or for the benefit of the first utility's retail customer.  *See, e.g.*, Jon R. Mostel, *Overview of Electric Industry Bypass Issues*, 37 Nat. Resources J. 141, 150-51 (1997).  A retail customer is an ultimate consumer:  an end user who consumes the power rather than transferring it to someone else.

On October 24, 1992, Congress enacted the Energy Policy Act of 1992 (the "Act"), Pub. L. No. 102-486, 106 Stat. 2776, which addressed various types of wheeling.  Congress "authorized FERC to order individual utilities to provide transmission services to unaffiliated wholesale generators (*i.e.*, to 'wheel' power) on a case-by-case basis," *New York v. FERC*, 535 U.S. 1, 9, (2002)—that is, to order wheeling arrangements where the power would be delivered by one utility to another utility rather than to or for the benefit of an ultimate consumer, *see* 16 U.S.C. §§ 824j, 824k.  But Congress barred FERC from ordering retail wheeling under almost every circumstance, emphasizing that the retail nature of such transactions

makes them a matter for the states. *See id*. § 824k(h)(2) (preserving "authority of any State" regarding "transmission of electric energy directly to an ultimate consumer"); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 279 (2016); *see also* 92 Stat. 3117, 3137 (predecessor provision).

The limited parameters of permissible FERC-ordered retail wheeling are laid out in 16 U.S.C. § 824k(h), a subsection that Congress entitled "Prohibition on mandatory retail wheeling and sham wholesale transactions."  106 Stat. 2916. Section 824k(h) states that "[n]o order issued under this chapter shall be conditioned upon or require the transmission of electric energy: (1) directly to an ultimate consumer, or (2) to, or for the benefit of, an entity if such electric energy would be sold by such entity directly to an ultimate consumer."  16 U.S.C. § 824k(h)(1)-(2). The provision then sets forth two limited exceptions, only the second of which is at issue here.  The Commission can order retail wheeling as to certain types of state and federal entities, *see id.* § 824k(h)(2)(A), if the entity "would utilize transmission or distribution facilities that it owns or controls to deliver all such electric energy to such electric consumer," *id.* § 824k(h)(2)(B).  The Commission also can order retail wheeling for the benefit of a state or federal entity that would sell the energy

6

"directly to an ultimate consumer" if that entity "was providing electric service to such ultimate consumer on October 24, 1992." *Id.* § 824k(h)(2)(B).[2]

As this Court has recognized, the exception that applies only when an entity "was providing electric service to such ultimate consumer on October 24, 1992," 16 U.S.C. § 824k(h)(2)(B), is a "grandfathering" exception, 24 F.4th at 661-62. It allows FERC to order retail wheeling only with respect to energy that an entity sells to an ultimate consumer who actually was receiving service from that entity at the time of the Act's effective date. *See Black's Law Dictionary* (11th ed. 2019) ("*Black's*") ("grandfather clause" exempts "a class of persons or transactions because of circumstances existing before [a] new rule or regulation").

**2. *San Francisco's power supply system and PG&E's tariff.*** San Francisco "owns a power supply system in the Hetch Hetchy Valley and transmission lines that transmit" that power. 24 F.4th at 655. San Francisco "obtained the property rights to develop the Hetch Hetchy System under the Raker Act of 1913," *id.*, which states that San Francisco "shall develop and use" the "hydroelectric power" generated in the Valley "for the use of its people," Pub. L. No. 63-41 § 9(m), 38 Stat. 242, 248-49 (1913).

---

[2] Section 824k(h), sometimes referred to as Section 212(h), amended Federal Power Act Section 212. *See id.*; A5-6 (Addendum).

In enacting the Raker Act, Congress envisioned that San Francisco could supply power generated by the Hetch Hetchy system to customers in the city using its own transmission and distribution lines. *See, e.g.*, *United States v. San Francisco*, 310 U.S. 16, 26 (1940); *Starbuck v. San Francisco*, 556 F.2d 450, 456 (9th Cir. 1977). But San Francisco failed to meet that expectation. It refused to pay the cost of constructing for itself the distribution lines and system necessary to convey to ultimate consumers the power traveling over its transmission lines. *See Starbuck*, 556 F.2d at 456; *San Francisco v. United Airlines*, 616 F.2d 1063, 1068 (9th Cir. 1979). San Francisco thus "does not own distribution lines" or a distribution system that can deliver power to its ultimate customers. 24 F.4th at 655.

Instead, San Francisco has long depended on PG&E for retail wheeling of San Francisco's power to San Francisco's customers. Nearly all of San Francisco's retail customers in the city have been (and continue to be) served electricity using PG&E's distribution lines and facilities. 24 F.4th at 655. From 1945 to 2015, PG&E voluntarily provided retail wheeling of San Francisco power to San Francisco's customers under "a series of bilateral agreements." *Id.*

In 2015, the Commission approved a revised version of PG&E's open-access FERC tariff (the "Tariff")—on which PG&E and its customers, including San Francisco, agreed—governing the conditions under which San Francisco could use

8

PG&E's distribution system beginning on July 1, 2015.  24 F.4th at 655, 661-62.[3] Section 14.2 of that Tariff states that, unless San Francisco can "demonstrate bona fide ownership or control" of its own "[d]istribution facilities" to deliver energy to a point of delivery that San Francisco proposed to add on or after that date, retail wheeling to such a new point of delivery is available only if San Francisco "meets the criteria for grandfathering in 16 USC § 824k(h)(2)."  JA__ (Order ¶ 26).  Section 14.2 also states that, "[t]o the extent" that San Francisco "intends to invoke this Grandfathering provision," San Francisco must "demonstrat[e] that, for each Point of Delivery for which it claims eligibility for Grandfathering, the criteria of 16 USC § 824k(h)(2) are met."  *Id.*; *see* JA__ (Tariff §§ 2.14, 2.29) (defining "Point of Delivery" as "Point(s) on" PG&E's "Distribution System where capacity and energy transmitted by" PG&E "will be made available"); *see also* JA__ (Tariff § 1.2) (no service "if the Commission would be prohibited from ordering such service under Section [824k](h)").

### 3. *Dispute between San Francisco and PG&E.*

**a.** *Initial Commission proceedings.*  In 2014, San Francisco filed a complaint with the Commission alleging "that PG&E was improperly denying Tariff service to some of San Francisco's delivery points" where San Francisco did not own or

---

[3] The Tariff at issue was in effect from July 1, 2015 to April 15, 2021.  JA__ (Order ¶¶ 31, 41 & n.66, 89).

control its own distribution facilities.  24 F.4th at 662.  Thus, only the grandfathering

exception in Section 824k(h)(2) is pertinent to this case; the separate exception

covering an entity that uses "transmission or distribution facilities that it owns or

controls to deliver" energy to an ultimate consumer, 16 U.S.C. § 824k(h)(2), has no

application.

PG&E stated that points of delivery—that is, physical places through which

power flowed—to which San Francisco had not provided service on October 24,

1992, were not eligible for grandfathering treatment.  24 F.4th at 662.  According to

San Francisco, however, PG&E was required to wheel San Francisco's power to

serve *any* of a wide range of "types of customers," including "commercial and

residential customers that provide City services or that have a connection to the

City's operations and programs," JA__ (Complaint 19), so long as San Francisco

provided service in October 1992 to even a single consumer of that "type[]."  PG&E

offered to provide "Tariff-equivalent" service to delivery points to which San

Francisco was providing electric service on June 30, 2015, effectively extending

grandfathered treatment beyond delivery points in service on October 24, 1992.  24

F.4th at 662-63; *see* JA__ (Order ¶¶ 3-6).[4]

_____

[4] When San Francisco's distribution service transitioned to the Tariff on July 1, 2015,
PG&E did not deny service to any San Francisco points of delivery in dispute; all
points received Tariff service.  The appendices to San Francisco's service agreement
characterized points of delivery PG&E deemed eligible for service under the Tariff

An ALJ examined the Tariff's reference to Section 824k(h)(2) and a series of previous Commission orders (the "*Suffolk County* orders") and ruled that the statute "grandfathered the '*class* of customers eligible to receive service'" in October 1992. 24 F.4th at 663. The judge concluded that the *Suffolk County* orders made grandfathering under Section 824k(h)(2) applicable to "all *potential retail customers within the class*" the utility was serving on October 24, 1992, regardless of whether they were actually receiving service on that date. *Suffolk County Electrical Agency*, 108 FERC ¶ 61,173, 62,036 (2004); *see* 24 F.4th at 662-63.

The Commission disagreed, denied San Francisco's complaint, and deemed PG&E's approach "just and reasonable." 169 FERC ¶ 61,128, 61,704 (2019). The Commission stated that it "was not 'interpreting the scope of [Section 824k(h)],' but instead only interpreting PG&E's Tariff." 24 F.4th at 663 (citation omitted). The Commission acknowledged the *Suffolk County* orders and the Tariff's reference to Section 824k(h)(2)'s grandfathering criteria. JA__ (Order ¶ 7); 24 F.4th at 663. But the Commission concluded that, given the Tariff's focus on "points of delivery," the Tariff could not be read to adopt a "class of customer" approach—that is, to apply to "all customers requesting new or revised service, regardless of their location,

---

as "WDT-Qualified" and characterized points of delivery PG&E agreed to continue to serve as an accommodation as "Tariff-equivalent." JA__ (Order ¶¶ 30, 41); *see* 24 F.4th at 662. In response to the Order, PG&E made a compliance filing that recharacterized the "Tariff-equivalent" points as "WDT-Qualified."

ownership structure, or other modifications to their existing delivery points." 169 FERC at 61,704. Otherwise, the Commission explained, there was a risk that "*all* San Francisco customers" would be grandfathered, "thereby negating the point of delivery framework." 24 F.4th at 663 (citation omitted); *see* JA__ (Order ¶ 7). The Commission instead read the Tariff to give San Francisco "grandfather status" as to "each delivery point that existed and was being served by San Francisco as of October 24, 1992." 169 FERC at 61,700.

    **b. *This Court's decision.*** On appeal, this Court vacated the Commission's order. The Court concluded that the Tariff "unambiguously . . . incorporates the requirements of" Section 824k(h)(2) and that the Commission erred in failing to interpret that statutory language to decide "eligibility for service" under the Tariff. 24 F.4th at 663 (citation omitted); *see id*. at 664-65 (stating that Tariff's "references to 'points of delivery' do not change the fact that the Tariff expressly references the criteria of Section [824k(h)(2)]"). The Court rejected the notion that applying the statutory criteria would "render Section 14.2 [of the Tariff] meaningless," explaining that "[a]ny end-use customers San Francisco did not serve in 1992 could not qualify for the Section 14.2 exception." *Id.*; *see id.* at 665. Finally, the Court faulted the

Commission for departing from the *Suffolk County* orders without adequate explanation.  *Id.* at 664-65.[5]

This Court made clear that it was not itself engaging in any interpretation of Section 824k(h)(2).  Rather, the Court remanded the case so that the Commission could undertake that interpretation.  24 F.4th at 664.

**c.  *Commission proceedings on remand.***  In its order on remand (the "Order"), the Commission noted that Section 14.2 of the Tariff "expressly references the criteria of [S]ection [824k(h)(2)] to determine the universe of eligible customers that are grandfathered," JA__ (*id.* ¶ 32), and concluded that the "*Suffolk County* precedent applies to the [Tariff's] reference to [S]ection [824k(h)(2)]" and governs the Tariff's meaning, JA__ (Order ¶ 30).[6]

The Commission understood the *Suffolk County* orders to set forth a sweeping interpretation of Section 824k(h)(2)'s grandfathering exception.  JA__ (Order ¶ 33).  Under those orders, the Commission stated, that exception covers "not only the customers" who were "actually" being served by the relevant entity on October 24, 1992, "but also '*all potential* retail customers within the class'" the entity had been serving on that date.  JA__ (Order ¶¶ 32-33) (emphasis in original).  According to

---

[5] The Court also addressed a voltage dispute not at issue here.

[6] The Order "applies only to the period between July 1, 2015 and the effective date of" a new 2021 tariff.  JA__ (*id.* ¶ 31 n.66).

the Commission, Section 824k(h)(2) is "not limited in time" and "applies prospectively to the entire class of customers eligible to receive service" on the relevant date—that is, to "new" consumers who bear some kind of (unspecified) resemblance to consumers that were being served in October 1992, even if at that time the new consumers were not receiving service from the entity, had no relationship with the entity, had not yet "moved into" the geographic area where the entity provides service, or did not even *exist*. JA__ (*id.* ¶¶ 33-34); *see* JA__ (*id.* ¶ 36) (interpretation of Section 824k(h)(2) covering only "customers existing on October 24, 1992," and not those "who initiate service thereafter," is "too narrow"); JA__ (*id.* ¶¶ 37-39) (new customers to "be grandfathered" as "San Francisco's customer base . . . change[s] with time"). This brief refers to the Commission's explanation of the grandfathering exception here as the "class-based approach."

Applying the class-based approach, the Commission rejected PG&E's argument that only specific points of delivery that were receiving service on October 24, 1992, were eligible for grandfathering under the Tariff, stating that such an approach "is at odds with" the *Suffolk County* orders. JA__ (Order ¶ 37). Instead, the Commission looked to various sources, including "categories" contained in a defunct 1987 agreement between PG&E and San Francisco, to try to define broad "class[es]" of "grandfathered customers." JA__ (*id.* ¶ 38); *see* JA__ (*id.* ¶ 39). Among the classes identified by the Commission were "[c]ity agencies and related

public entities, [c]ity properties and tenants on those properties," and private "entities providing services on behalf of or in coordination with the [c]ity"; "Residential, Commercial Building, Other Commercial, Industry, Other Industry, Agriculture, Water Pumping, and Street, Outdoor, Traffic Control"; and "small unmetered loads," which describes delivery of power to unmetered locations such as streetlights.  JA__ (*id.* ¶¶ 38-40).

PG&E timely sought rehearing, and the Commission issued an order deeming rehearing denied.  JA__ (181 FERC ¶ 62,198).  PG&E timely petitioned for review. No. 23-1041.

Subsequently, the Commission issued an order (the "Rehearing Order") substantively addressing the arguments raised on rehearing and "modifying the [Order's] discussion" while "continu[ing] to reach the same result."  JA__ (Rehearing Order ¶ 3).  The Commission stood by its decision to adopt the class-based approach, stating that "reasoned decision-making required the Commission" to "apply" the *Suffolk County* orders and that grandfathering under Section 824k(h)(2) is "not limited to the specific retail customers served" by San Francisco "on October 24, 1992."  JA__, __ (*id.* ¶¶ 40, 44); *see* JA __ (*id.* ¶¶ 41-43).  The Commission conceded that "the text of [S]ection 212(h)(2) refers to 'consumer' in the singular."  JA__ (*id.* ¶ 53).  But the Commission stated that it would be "unfair to individual retail customers" not to use a class-based approach, especially where

15

after October 24, 1992 "another customer . . . move[s] into a location San Francisco" had previously served but "San Francisco otherwise" had "provided similar service to" that earlier customer. JA__ (*id.* ¶ 55); *see* JA__ (*id.* ¶ 54). The Commission also stated that there was no legislative history specifically indicating rejection of a customer-class approach. JA__ (*id.* ¶ 56). Finally, the Commission said that the *Suffolk County* orders are "consistent with the basic concept of grandfathering and do[] not expand the class of grandfathered customers beyond those contemplated by Congress" in Section 824k(h)(2)(B), claiming that grandfathering anyone who could fall into a class that existed on October 24, 1992, was a way of "maintain[ing] the status quo that existed as of" that date. JA __ (*id.* ¶ 59).

Given its embrace of the class-based approach, the Commission rejected PG&E's other arguments. The Commission stated that "limiting eligibility for grandfathering to specific delivery points receiving service on October 24, 1992," based on the Tariff language about points of delivery, "would contravene" the *Suffolk County* orders "because it would have the same effect as restricting the grandfathering provision to individual retail customers actually receiving service on October 24, 1992, rather than the class of customers eligible to receive service from San Francisco on October 24, 1992." JA__ (Rehearing Order ¶ 61). In addition, the Commission dismissed the possibility of unduly preferential treatment for San Francisco or any problematic "policy consequences" arising from effectively

16

"extend[ing] grandfathering to all electric service in San Francisco," and disclaimed reliance on "concerns" about "competition." JA__ (*id.* ¶¶ 70-72).

The Commission adjusted its prior order only as to the definition of the classes of consumers served on October 24, 1992. The Commission deemed "eligible for grandfathering" consumers falling into "a series of categories" set forth in a 1987 agreement, which include "Municipal Load," "Irrigation District[]" obligations, and "a set of residual categories." JA__ (Rehearing Order ¶ 68); *see* JA__ (*id.* ¶ 69 & n.163). So long as San Francisco served any consumer in such a category on October 24, 1992, the Commission concluded, any new or additional consumer that could be broadly categorized the same way would qualify for grandfathering, even if that new or additional consumer did not exist or was not served by San Francisco on October 24, 1992. JA__ (*id.* ¶ 69). The Commission did not alter its conclusion that "private parties" and "unmetered loads" also were covered by the grandfathering provision. And, because the Commission deemed Section 824k(h)(2) and the Tariff to cover *classes* of consumers, the Commission did not try to identify "ultimate consumer[s]" that San Francisco actually served on October 24, 1992.

PG&E timely petitioned for review of the Rehearing Order and, once again, of the Order (together, the "Orders"). No. 23-1127. This Court consolidated PG&E's petitions.

17

## STANDARD OF REVIEW

This Court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

## SUMMARY OF ARGUMENT

As this Court has previously concluded, the Tariff "incorporates the requirements of" Section 824k(h)(2), 24 F.4th at 663, which provides a grandfathering exception to the ban on FERC-mandated retail wheeling where an entity seeking to sell energy "directly to an ultimate consumer" was "providing electric service to such ultimate consumer on October 24, 1992." 16 U.S.C. § 824k(h)(2). The Orders here rest entirely on an interpretation of that statutory provision, concluding that Section 824k(h)(2) provides for a class-based approach and that the Tariff therefore sweeps in not only service to "all end-use customers served by San Francisco as of October 24, 1992," but also service to "all customers that belong to that same class of customers"—that is, ultimate consumers that were *not* served by San Francisco in October 1992 but that have some unspecified characteristic in common with a consumer that was served at that time, such that both consumers can be thought to fall into some common general category. JA__ (Order ¶ 37).

That interpretation is manifestly contrary to the statute's text as well as to its "structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). The statute's text, which uses the singular "ultimate consumer" and the indefinite article "an," applies the grandfathering exception only as to *particular* ultimate consumers who were actually *provided* with service in October 1992. Section 824k(h)(2) nowhere mentions any "class" or other group of consumers, and its unambiguous language does not accommodate any interpretation that somehow encompasses consumers *not* provided with service on the relevant date.

The error of the class-based approach is particularly apparent in light of the Congress's express reference to "classes" of ultimate consumers elsewhere in the same 1992 statute that added Section 824k(h)(2) to the U.S. Code. Moreover, a class-based approach to the grandfathering exception runs directly contrary to the purpose of the statute, which was to create a limited exception that faded out over time to ensure that FERC did not encroach on the States' authority to regulate retail transactions and that FERC did not harm competition through mandated retail wheeling. Indeed, the Commission's approach creates such broad eligibility for grandfathering as to effectively swallow the statutory ban on FERC-ordered retail wheeling. That approach also cannot be reconciled with the Act's legislative history, which emphasizes the narrowness of Section 824k(h)(2)'s exceptions.

19

Because the statute is clear, "that is the end of the matter." *Chevron, U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-843 (1984).  And even if there were some ambiguity, the Commission's unreasonable decision is not entitled to any deference.  The Commission did not actually *interpret* the statute; instead, it rested on the *Suffolk County* orders, which themselves do not grapple with the statutory text but merely interpret *prior Commission* orders and make abstract policy-based pronouncements.  Accordingly, the Commission's orders here must be vacated so that the Commission can interpret the Tariff with an accurate understanding of the relevant statutory requirements.

Vacatur also is warranted on independent grounds.  The Commission's approach to Section 824k(h)(2), which drove interpretation of the Tariff, is arbitrary and capricious because the statute cannot be read to *mandate* a class-based approach and the Commission has not sufficiently justified such an approach.  And even assuming that the class-based approach could survive this Court's review, the Orders are nevertheless arbitrary and capricious for several reasons.  First, the Commission did not provide a reasoned explanation of how to define a "class" in this context, and indeed struggled unsuccessfully in both Orders to define relevant classes clearly. Second, the Commission did not provide a reasoned explanation of how its interpretation of the Tariff gives meaning to the Tariff language requiring San Francisco to demonstrate that, "for each *Point of Delivery* for which it claims

eligibility for Grandfathering, the criteria of 16 USC § 824k(h)(2) are met." JA__ (Tariff § 14.2) (emphasis added). The Commission's statements about how the class-based approach to Section 824k(h)(2) and the Tariff's references to "Point[s] of Delivery" interact with each other are fundamentally incoherent.

## STANDING

The Orders arise from a complaint that San Francisco filed at the Commission against PG&E, and they interpret Section 824k(h)(2) and the Tariff in a manner unfavorable to PG&E. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017); *Louisiana Energy v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998).

## ARGUMENT

## I.    The Orders Rest On An Incorrect Interpretation of Section 824k(h)(2)

The Orders rest on the Commission's class-based approach to § 824k(h)(2), which entirely drove the Commission's analysis of the Tariff. But the Commission's statutory interpretation is incorrect. It contradicts the unambiguous language of the statute and flouts the statute's purpose. That legal error dictates vacatur.[7]

---

[7] A "*Chevron*-like" standard of review applies to tariff interpretation. *Old Dominion Elec. Coop. v. FERC*, 518 F.3d 43, 48 (D.C. Cir. 2008) (citation omitted).

A.    **Section 824k(h)(2) Bars The Commission's Class-Based Approach**

1.    *The Commission's class-based approach is irreconcilable with the statute's plain text.*  As relevant here, Section 824k(h)(2) states that no order shall require transmission of energy "to, or for the benefit of, an entity if such electric energy would be sold by such entity directly to an ultimate consumer," unless "such entity was providing electric service to such ultimate consumer on October 24, 1992."  16 U.S.C. § 824k(h)(2).  That text cannot be read to extend grandfathering to a "class" of ultimate consumers that includes consumers who were not being "provid[ed] electric service" by the relevant entity "on October 24, 1992."  *Id*. Rather, the provision's plain text permits grandfathering only on a consumer-by-consumer basis as to each *specific* ultimate consumer who actually received service from the relevant entity (here, San Francisco) on the relevant date.

That conclusion is dictated by numerous aspects of that text.  First, "ultimate consumer" is singular and is introduced by the indefinite article "an"—and then, in a later part of the same sentence, the originally referenced "ultimate consumer" is referred back to by use of the phrase "such ultimate consumer."   16 U.S.C. § 824k(h)(2); *see, e.g.*, *Interstate Fire & Cas. v. Roman Cath. Church*, 761 F.3d 953, 955 (9th Cir. 2014) ("such" means the thing "just specified"); *Black's Law Dictionary* 1432 (6th ed. 1990) (same).  The singular "ultimate consumer" refers to a specific consumer that was receiving power for its own use, not an undifferentiated

mass or group of consumers that are doing so. *See* 16 U.S.C. § 824k(h) (entitled "Prohibition on mandatory retail wheeling"); *Black's* (defining "retail" as "sale of goods or commodities to ultimate consumers" and not "for further distribution or processing"). Moreover, as the Supreme Court has explained, the indefinite articles "a" and "an" mean "[s]ome undetermined or unspecified particular," *McFadden v. United States*, 576 U.S. 186, 191-92 (2015) (citation omitted), and refer to "a discrete, countable thing," *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481 (2021); *see id.* (statutory provision requiring "a notice to appear" required government to send single document containing all relevant information, not multiple notices over time); *see also, e.g.*, *United States v. Black*, 25 F.4th 766, 771 (10th Cir. 2022) ("the article *a* specifies a particular item" (citing *Banuelos v. Barr*, 953 F.3d 1176, 1181 (10th Cir. 2020)). Accordingly, in Section 824k(h)(2)(B), "such ultimate consumer" refers to a discrete, particular consumer that the relevant entity wishes to serve.

Second, the provision extends only to an "ultimate consumer" to which the relevant "entity was *providing electric service* . . . on October 24, 1992." 16 U.S.C. § 824k(h)(2)(B). Requiring that the entity *have provided* service to an ultimate consumer at a specified point in the past in order for that same ultimate consumer to be eligible for grandfathering demonstrates that Congress did not intend for the grandfathering exception to extend to other ultimate consumers that did not exist at all on that date or that were not provided service on that date by the relevant entity.

Put differently, it would be impossible to deem San Francisco to have "*provide[d]* electric service" in October 1992 to a seafood restaurant that opened its doors in 2002.  Nor could that restaurant be deemed to have *consumed* electricity that San Francisco had on offer a decade earlier.  *See* https://www.merriam-webster.com/dictionary/consumer ("consumer" is "one that consumes:  such as . . . one that utilizes economic goods"); *Black's* (similar).  Yet that is exactly what the Commission's class-based approach requires.  So long as the new consumer is sufficiently similar in some unspecified way to a *different* consumer that *did* receive service and *did* exist on October 24, 1992, the Commission's approach pretends that the new consumer was indeed "provid[ed] electric service" by the entity on that date.  That approach impermissibly "rewrite[s]" the statutory text.  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Finally, Section 824k(h)(2) nowhere mentions the word "class" or any equivalent thereof.  There is no warrant for the Commission to read the word "class" into the statute when it does not appear there.  *See, e.g.*, *Util. Air*, 573 U.S. at 328.  Had Congress intended for the grandfathering exception to cover classes of ultimate consumers, Congress undoubtedly would have provided some guidance about how to define a class—for instance, by explaining what property or attribute a new consumer must have in common with a consumer that actually received service on

October 24, 1992, that would place those two consumers into the same "class." *See* https://www.merriam-webster.com/dictionary/class.

The Dictionary Act (which the Orders never mention) does not change any of that textual analysis. That Act states that "words importing the singular include and apply to several persons, parties, or things," unless statutory context indicates otherwise. 1 U.S.C. § 1. But that does not "transform" the "singular . . . into the plural" such that it makes the singular "ultimate customer" refer to a large *category* of consumers. *Niz-Chavez*, 141 S. Ct. at 1482; *see United States v. Hayes*, 555 U.S. 415, 422 n.5 (2009) (Dictionary Act yields to context). Rather, "it tells us only that a statute using the singular 'a' can apply to multiple persons, parties, or things." *Niz-Chavez*, 141 S. Ct. at 1482; *see id.* (under Dictionary Act, statute referring to "a notice to appear" permits "send[ing] multiple notices to appear to multiple people" but "does not mean a notice to appear can consist of multiple documents"). There is no question that Section 824k(h)(2) is capacious enough to cover *multiple* discrete "ultimate consumer[s]" to which the relevant entity provided electric service in October 1992. *See, e.g.*, *United States v. Otunyo*, 63 F.4th 948, 957 (D.C. Cir. 2023) (reading "an" to mean "any one"). After all, presumably an entity providing electric service generally provides it to more than one ultimate consumer. But that does not transform clear statutory language requiring individualized verification of prior electric service to "an ultimate consumer" in October 1992 into coverage of a broad

25

class of consumers containing members that were not, in fact, provided service on the key date. *See Niz-Chavez*, 141 S. Ct. at 1480, 1483. It remains true that a "particular[ized]" inquiry as to the service received by each ultimate consumer in October 1992 is required. *McFadden*, 576 U.S. at 191-92.

> 2. ***The statutory context strongly confirms that Section 824k(h)(2) bars the Commission's class-based approach***. "[A] wider look at [statutory] structure" and context, *Niz-Chavez*, 141 S. Ct. at 1482, strongly confirms that Section 824k(h)(2) forecloses the Commission's class-based approach.

Conclusive contextual evidence that Congress did not intend "an ultimate consumer" to mean "class of customers" can be found in the very same statutory enactment that created Section 824k(h)(2). Section 824k(h)(2) was enacted as Section 722 of the Energy Policy Act of 1992. 106 Stat. at 2916-17. In Section 111(e) of that Act, now codified as a note to 16 U.S.C. § 2621, Congress required the Commission to report on whether integrated resource planning was likely to result in "higher or lower electricity costs to an electric utility's *ultimate consumers or to classes or groups of such consumers*." 106 Stat. at 2796 (emphasis added).

In the face of Section 111(e), the Commission's class-based approach cannot be a permissible construction of Section 824k(h)(2), in which Congress chose to refer only to "an ultimate consumer" and *not* to "ultimate consumers or classes or groups of such consumers." The different language that Congress used in Section

111(e) and Section 722 of the Act must mean two different things.  *See, e.g.*, *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (if "Congress includes particular language in one section of a statute but omits it in another section of the same Act," Congress presumably "acts intentionally and purposely" (citation omitted)); *Allina Health v. Price*, 863 F.3d 937, 944 (D.C. Cir. 2017).  Interpreting Section 824k(h)(2) *as if it said* "classes" or "groups" of ultimate consumers would amount to a "rewrit[ing]" of that provision—and that is not a permissible mode of statutory interpretation.  *Pharm. Mfg. Rsch. v. FDA*, 957 F.3d 254, 262 (D.C. Cir. 2020) (citation omitted); *see, e.g.*, *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020); *Util. Air*, 573 U.S. at 328; *Russello v. United States*, 464 U.S. 16, 23 (1983).

Moreover, the close juxtaposition within Section 111(e) of the phrase "ultimate consumers" and the separate phrase "classes of groups of such consumers" establishes that the language Congress chose in Section 824k(h)(2) cannot be read to encompass a class.  Even the *plural* reference to "ultimate consumers" in Section 111(e) does not encompass "classes or groups of such consumers"; if it did, then the separate phrase "classes or groups of such consumers" in that provision would be superfluous, which is not an acceptable way to interpret a statute.  *See, e.g.*, *TRW v. Andrews*, 534 U.S. 19, 31 (2001); *Genus Med. Techs. v. FDA*, 994 F.3d 631, 638-39 (D.C. Cir. 2021).  Still less, then, can the *singular* "an ultimate consumer" in Section

824k(h)(2)(B) encompass a whole class of consumers, as it does under the Commission's class-based approach.

The statutory context provided by Section 111(e) therefore belies the Commission's statutory interpretation—and it is not the only context that makes clear that the Commission's interpretation cannot be correct. Portions of 16 U.S.C. § 2621—the same provision as to which Section 111(e) is now appended as a note— also refer specifically to "class[es]" of "consumers." 16 U.S.C. § 2621 (rates for "service to each class of electric consumers"). So, too, do surrounding statutory provisions. *Id.* § 2625 (cost of service and rates for "each class of electric consumers"); *id.* § 2643 ("costs of serving each electric consumer class"). And other provisions of the Federal Power Act refer to groups of "consumers" as well. Indeed, even Section 824k(h)(2) refers to a mass of consumers together as the "public." *Id.* § 824k(h)(2)(A) (entity "oblig[ed]" to "provide electric service to the public").

Congress's decision to eschew in Section 824k(h)(2)(B) terms such as "class" and "the public," which were right at its fingertips, is plainly a meaningful one. This Court should give force to Congress's decision to refrain from using in Section 824k(h)(2)(B) any term that connotes a class of consumers. *See, e.g.*, *Russello*, 464 U.S. at 23.

**3.** ***The Commission's class-based approach is directly contrary to the statute's purpose.*** Although the statutory text alone is a sufficient basis to reject the

Commission's class-based approach, that approach also is irreconcilable with Congress's purpose in enacting Section 824k(h). *See Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019).

Section 824k(h)(2) creates a narrow grandfathering exception to what is otherwise a broad prohibition on FERC-mandated retail wheeling. *See* 16 U.S.C. § 824k(h)(1)-(2). That exception is narrow for very good reasons. First, addressing retail transactions is the province of the States, not the federal government, so Section 824k(h)(2) has a strong federalism component: it prevents the federal government from encroaching in an area where FERC does not have regulatory authority. *See, e.g.*, *Elec. Power Supply Ass'n*, 577 U.S. at 280; Mostel, 37 Nat. Resources J. at 150-51; Cassandra Burke Robertson, *Bringing the Camel into the Tent: State and Federal Power over Electricity Transmission*, 49 Clev. St. L. Rev. 71, 75 (2001); *see also* 16 U.S.C. § 824k(h) (subsection shall not affect "authority of any State or local government under State law" concerning "transmission of electric energy directly to an ultimate consumer"). Second, Section 824k(h)(2) helps ensure that the companies being asked to wheel power to eligible entities are not injured, to the detriment of consumers, through orders that do not provide adequate protections and compensation for costs incurred. *See* 16 U.S.C. §§ 824j, 824k(a)-(c) (including protective preconditions for order requiring non-retail wheeling); *see*

also, e.g., *The Shape of Competition Under Title VII of the Energy Policy Act of 1992*, 47 Admin. L. Rev. 493, 497-98 (1995).

The exception at issue is also narrow in a very specific way:  it is a "grandfathering" provision that contains a temporal cut-off.  *E.g.*, 24 F.4th at 654; *see* JA__ (Tariff § 14.2).  Such a provision is intended to balance a change in the law with a need to protect certain pre-existing relationships that do not meet new requirements—here, relationships between the entity seeking retail wheeling and particular consumers to whom the entity already was providing service when the statute was enacted on October 24, 1992.  *See, e.g.*, *SoundExchange v. Muzak*, 854 F.3d 713, 719 (D.C. Cir. 2017) ("grandfather provisions were intended to protect prior investments" made in different "regulatory climate").  But such existing arrangements do not last forever, and grandfathering provisions do not provide an exception for *new* arrangements.  Accordingly, the practical force of such provisions fades out over time, thus making the "move" to a new regulatory scheme complete. *Id.*; *see, e.g.*, *United States v. Allan Drug*, 357 F.2d 713, 718 (10th Cir. 1966) (a "Grandfather Clause exception" construed "strictly against one who invokes it"); *Honeywell v. United States*, 661 F.2d 182, 186 (Ct. Cl. 1981) (same, citing cases). Here, some of the "ultimate consumers" receiving service from San Francisco in 1992 have shut down, moved out of the area, or made different choices about obtaining power—or will yet do so.  And as that process occurs, the ban on retail

wheeling will take a firmer and firmer hold, with fewer and fewer exceptions. That helps further Congress's evident purpose to keep a tight constraint on FERC-mandated retail wheeling.

The Commission's class-based approach would undermine Congress's purpose. Instead of reading the statute to start with a defined set of particular, identifiable consumers and then to winnow their ranks through the passage of time, the Commission's approach swells the ranks of the grandfathered with *brand-new consumers*—and does so without limit, so long as the new consumers bear some (unspecified) resemblance to the old ones. Indeed, the class-based approach would perpetuate "grandfathered" service indefinitely because the number of included consumers could continually expand until virtually all current and future consumers were grandfathered, in which case the grandfathering exception would effectively swallow the original rule barring FERC-ordered retail wheeling. In its prior opinion in this case, this Court rejected the concern that "*all* customers within the class of customers taking service on October 24, 1992 [c]ould be grandfathered in perpetuity," 24 F.4th at 664-65, on the ground that "[a]ny end-use customers San Francisco did not serve in 1992" would not fall within the scope of Section 824k(h)(2)(B) and therefore "could not qualify." *Id.* But the Commission's Orders *do* place within the scope of the grandfathering exception "[a]ny end-use customers San Francisco did not serve in 1992" who can be said to fall within the same (ill-

defined) category as an end-use consumer that San Francisco *did* serve in 1992. That approach seriously erodes Congress's prohibition on FERC-ordered retail wheeling, and thereby improperly expands the Commission's powers, risks encroaching on areas of state authority, and threatens to undermine competition by subjecting to serious harms utilities that are required to wheel power.

The class-based approach also undermines Congress's purpose in an additional way: it makes the grandfathering exception extraordinarily difficult to administer. What characteristic must different consumers have in common to make it appropriate to place them in the same "class" when applying Section 824k(h)(2)? *See United States v. Hubbell*, 167 F.3d 552, 578 (D.C. Cir. 1999) (per curiam). Because the statute says nothing about "classes" of consumers, it does not provide *any* criteria for how to define such a class, and the Commission has never provided any coherent guidance. Indeed, the Commission struggled and failed to clearly define the classes it asserts are at issue in this very case. The Order defined the relevant categories in multiple, sometimes contradictory ways; the Rehearing Order altered that discussion but left significant ambiguity, while drawing on a case-specific document not created for the purpose of applying Section 824k(h)(2). *See* pp.14-17, *supra*. Such struggles over deciding what a "class" is, and the resulting cost and complexity of applying Section 824k(h)(2)(B), are plainly not what Congress intended when imposing a broad ban and then writing a narrow

grandfathering exception that does not contain the word "class" (or any equivalent term).[8]

The Rehearing Order nevertheless summarily asserts that the class-based approach is "consistent with the basic concept of grandfathering and does not expand the class of grandfathered customers beyond those contemplated by Congress." JA__ (Rehearing Order ¶ 59).  That assertion fails.  Because the Commission (in part) defined classes of consumers in this case by attempting to interpret an obsolete 1987 agreement between PG&E and San Francisco, the Commission asserts that it simply "maintain[ed]" the October 24, 1992, status quo and did not grandfather "arrangements" that came into existence after that date.  *Id.*  That contention ignores Congress's identification of October 24, 1992, as the specific moment in time to assess eligibility for grandfathering and the fact that San Francisco's customers changed dramatically over the many years that the 1987 agreement was operative and since 1992.  Critically, Section 824k(h)(2) *does not ask* whether there was a specific kind of relationship in October 1992 between the entity seeking retail wheeling (San Francisco) and the *utility* that would provide the wheeling (PG&E). It asks an entirely different question:  whether there was a specific kind of

---

[8] The Orders address the meaning of *the statute*, not just the Tariff, and therefore will come into play in future when an entity seeks a retail-wheeling order from the Commission.

relationship in October 1992 between the entity and the specific "ultimate consumer" that the entity seeks to serve.  As to that kind of relationship, the Orders do indeed change the October 1992 status quo, because they grandfather service arrangements between the entity and ultimate consumers that did not come into existence until after the statutorily specified date.

This Court has previously rejected a similar attempt by the Commission to expand the scope of a different grandfathering provision enacted as part of the Act. In *BP West Coast Products v. FERC*, 374 F.3d 1263 (D.C. Cir. 2004), the Court addressed a grandfathering provision providing that "any oil pipeline rate that was 'in effect' for a full year before the [Act's] enactment on October 24, 1992," and was not subject to protest during that year, "is 'deemed to be just and reasonable.'" *Id.* at 1271 (citing § 1803(a)(1) of the Act).  The Court rejected the Commission's effort to sweep into that provision rates that *could have been filed* before the relevant cut-off date but never were filed, stating that it is not proper for the Commission to "regulate rates as if they existed in a world that never was."  *Id.* at 1273-74.

The parallels to this case are obvious.  Here, too, the Commission has expanded a narrow grandfathering provision by suggesting that current or future consumers *might have* been eligible for service had they sought to obtain power from San Francisco on October 24, 1992.  Such an expansion is as destructive of Congress's purposes here as it was in *BP*, and it is irreconcilable with the statute.

*See* 374 F.3d at 1273-74; *see also, e.g.*, *ExxonMobil Oil v. FERC*, 487 F.3d 945, 959 (D.C. Cir. 2007).

    **4.** ***Legislative history belies the Commission's class-based approach.*** Should any doubt remain that the class-based approach is an impermissible reading of Section 824k(h)(2), the legislative history of that provision dispels it.

    That legislative history confirms that Congress intended the grandfathering provision to be quite narrow.  In discussing what is now Section 824k(h)(2), Senator Malcolm Wallop, the ranking member of the Senate Energy and Natural Resources Committee and a key champion of the Act, explained that the provision was "intended to allow the [Commission] to continue, but not expand existing retail wheeling arrangements."  138 Cong. Rec. 34,018 (Oct. 8, 1992).  He explained that under the provision, the Commission could not, through application of the grandfathering provision, "order the utility to wheel capacity, or wheel to facilities *of such person not now receiving such power*."  *Id.* (emphasis added).  The effect, he stated, was to keep things as they stood in October 1992 with regard to "amount, source, and delivery point" of wheeled power.  *Id.*; *see, e.g.*, 138 Cong. Rec. 32,083 (Oct. 5, 1992) (Rep. Lent).[9]

---

[9] Senator Wallop also emphasized that the agency should stop parties from circumventing the prohibition on FERC-ordered retail wheeling via "transactions" with "the underlying intent and effect" to "provide retail service to an ultimate

The Commission's class-based approach does, however, unquestionably "expand . . . retail wheeling," 138 Cong. Rec. 34,018, beyond what existed in October 1992 when the statute was enacted. That is because, under the Commission's approach, consumers that were not being provided power under a relevant retail-wheeling arrangement in October 1992, along with consumers that did not even exist in October 1992, can qualify for grandfathering if they somehow can be deemed to be in the same "class" as a consumer that *did* receive power though retail wheeling at that time.

The Commission's reasons for discounting the legislative history do not survive scrutiny. JA__ (Rehearing Order ¶¶ 56-58). The Commission was dismissive about floor statements—but here those statements are entitled to weight because they are directly on point and serve to confirm the purpose that is apparent from the statute's history and context. The Commission also asserted that the floor statements "reflect multiple, distinct motivations for establishing the prohibition on sham transactions and mandatory retail wheeling." JA__ (*id.*). That is not correct— but even if were, it would not change the fact that all the statements discussing Section 824k(h)(2) express congressional intent *not to expand* existing relationships between an entity like San Francisco and any ultimate consumer, *see* JA__ (ALJ

---

customer." 138 Cong. Rec. 34,018; *see* 138 Cong. Rec. 34,012 (Oct. 8, 1992) (Sen. Johnston).

Order ¶¶ 94-97), which is exactly what the Commission's class-based approach does.

The Commission contended that *here* its Orders did not truly result in any expansion of pre-October 1992 arrangements given that San Francisco has a "longstanding relationship purchasing from PG&E." JA__ (Rehearing Order ¶¶ 56-58). Even if it were true that there was no expansion here, it would not make the Commission's interpretation of the statute—which cannot have a meaning that varies case-by-case, *see Clark v. Martinez*, 543 U.S. 371, 380-81, 386 (2005)—any more tenable. *See* pp.33-34, *supra*. But it is not true, because Section 824k(h)(2) requires that an entity like San Francisco have provided service on October 24, 1992, to the *very same* ultimate consumer it seeks to serve in the present, and disregarding that limitation is a significant expansion of the only relevant pre-1992 arrangements. *See id.*

## B. The Orders Do Not Advance Any Legitimate Justification For The Commission's Contrary View Of Section 824k(h)(2).

Faced with those overwhelming indications that the statute unambiguously bars a class-based approach, the Commission provided essentially no justification for its contrary reading. The Commission rested almost entirely on its decision to simply follow the approach previously taken in the *Suffolk County* orders. But in those orders the Commission did not carry out any analysis of the text of Section 824k(h)(2). Rather, the Commission continually expanded the scope of the

grandfathering exception based on misreadings of the Commission's own *prior orders* and assertions about what the Commission thought was the best grandfathering policy. The Orders here are equally devoid of anything that resembles an *interpretation* of Congress's enactment rather than a mere assertion of the agency's preference to expand the grandfathering exception's scope. JA__ (Rehearing Order ¶¶ 54-55). Such "policy considerations cannot create an ambiguity when the words on the page are clear." *SAS Inst. v. Iancu*, 138 S. Ct. 1348, 1358 (2018); *see Patel v. Garland*, 142 S. Ct. 1614, 1627 (2022); *Util. Air*, 573 U.S. at 325-28 (agency cannot "rewrit[e] unambiguous statutory terms" to "suit its own sense of how the statute should operate"). The Commission's class-based approach does not reflect a reasonable interpretation of Section 824k(h)(2).

**1.** ***The* Suffolk County *orders do not interpret the statutory text or set forth a reasonable reading.*** The Commission's analysis of the class-based approach in this case consists almost entirely of a wholesale adoption of a statement in the final *Suffolk County* order. JA__ (Order ¶¶ 30-37). A close of examination of the *Suffolk County* orders, which the Commission issued in a sequence over the course of nearly a decade, is therefore warranted—and that examination demonstrates that the class-based approach is not only divorced from the text of Section 824k(h)(2) but also has its origins in a host of Commission errors.

In the first *Suffolk County* order, issued in 1996, the Commission interpreted the "ultimate consumer" language in Section 824k(h)(2) to cover not only consumers to whom a relevant entity was actually providing a flow of electricity on October 24, 1992, but also consumers whose "service was out" on that date—"for example, because a tree fell and severed the service line to that customer." 77 FERC ¶ 61,355, 62,550 & n.17. The facts of the particular case before the Commission did, indeed, involve a service outage that happened to occur on October 24, 1992, because of an "interrupt[ion]" in "hydropower deliveries." *Id.* at 62,546. The Commission concluded that "the grandfather provision applies only to . . . customers being served, or who were eligible to receive service, on October 24, 1992," apparently understanding such eligibility to involve a pre-existing contractual relationship between the entity providing service and the consumer. 77 FERC at 62,550. That is a modest expansion of the scope of the grandfathering exception found in Section 824k(h)(2)—albeit one that is perhaps illustrative of the maxim that bad facts make bad law, given that the Commission did not tie the expansion to anything in the actual text of the statute.[10]

---

[10] The Commission asserted (77 FERC at 62,550) that its approach was "consistent with" *City of Palm Springs*, 76 FERC ¶ 61,127 (1996)—but that decision *rejected* Palm Springs' argument that "wheeling for the benefit of new customers" who were not being served on October 24, 1992, "satisfies" Section 824k(h)(2)(B). 76 FERC at 61,701 & n.6.

From that baseline, the Commission's pronouncements about the scope of the grandfathering exception became increasingly more expansive and unreasonable as the Commission looked to the language of the preceding order in the *Suffolk County* sequence rather than to the text of the statute.  In the next *Suffolk County* order, issued in 2001, a reference to a "class" of consumers appeared for the first time.  The Commission stated that, "for grandfathering purposes, we interpret 'customers eligible to receive service'"—*which is the language from the prior* Suffolk County *order and appears nowhere in Section 824k(h)(2)*—"as the *class* of customers eligible to receive service."   96 FERC ¶ 61,349, 62,301 (emphasis added) (misquoting Section 824k(h)(2), which refers to "an ultimate consumer" and not to "customers"); *see* 102 FERC ¶ 63,037, 65,112 (2003).  That class, the Commission said, was not limited to consumers who were actually being served on October 24, 1992, or who simply lost power on that day.  *See* 96 FERC at 62,301.

The Commission's sole justification for its departure from the statutory language was a policy argument.  The Commission asserted, without citing any authority, that Congress would not have "intend[ed]" the "unfair[ness]" the Commission thought was associated with "a grandfathering provision" that "appl[ied] to individual retail customers" given that, "surely, in the almost nine years since October 24, 1992, some residential customers have died or moved out, while new residential customers have moved into (or within) the service area."  96 FERC

at 62,301. But that is just an expression of the Commission's *own* views about what is "fair"—and those policy views have nothing to do with the proper interpretation of the statutory language that Congress chose. *See, e.g.*, *Patel*, 142 S. Ct. at 1627; *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022) (impermissible to "replace the actual text with speculation as to Congress' intent" (citation omitted)). In any event, the Commission's policy argument is simply mistaken. There is nothing unfair about a provision that is intended to slowly winnow down the group of consumers eligible for a grandfathering exception. That is, in fact, the whole point of grandfathering, and here it helps enforce Congress's own policy choice to broadly forbid the Commission from ordering retail wheeling. *See* pp.28-35, *supra*.

Finally, in a *Suffolk County* order issued in 2004, the Commission—yet again failing to consider the language of the statute—articulated the specific standard regarding "potential" consumers within a "class" on which the Orders here rely. *E.g.*, JA__ (Order ¶¶ 33, 38); JA__ (Rehearing Order ¶¶ 27, 42). The Commission characterized a prior *Suffolk County* order as having concluded that, "because Suffolk [County] *was* providing retail service" on October 24, 1992, Suffolk County "was grandfathered and entitled to obtain a transmission order . . . to serve *all* potential retail customers within the class it had been serving." 108 FERC ¶ 61,173, 62,036. In other words, in deciding what it means to have a "class" of consumers— *language that, once again, does not appear anywhere in Section 824k(h)(2) but*

41

*rather is drawn only from a prior* Suffolk County *order*—the Commission concluded that grandfathering encompasses not just the group of consumers who were actually receiving service from the relevant entity on October 24, 1992, or even just those consumers plus any consumers who would have been receiving service from the relevant entity on that particular day had there not been some unusual interruption in their flow of electricity, but rather *any* consumer who *could have potentially received service* on that day had that consumer existed, sought to enter into a relationship with the relevant entity, and had (unspecified) characteristics in common with the entity's existing consumers such that they could all be conceived of as being in the same general category.

Read together, the *Suffolk County* orders reveal the void at the heart of the class-based approach. Those orders contain no reasonable reading of Section 824k(h)(2) or any actual statutory interpretation. They do not even appear to evince any recognition that the Commission was relying on language that originated only in prior Commission orders rather than anywhere in the statute itself, or that in doing so the Commission progressively expanded without any statutory basis the group of consumers covered by grandfathering. At most, the *Suffolk County* orders contain brief musings about the Commission's own view of the best approach to grandfathering and unsupported assertions about what the agency thought Congress must have intended. Perhaps unsurprisingly, the view expressed in those orders is

42

one that expands the agency's own powers—that is, it takes a narrow exception to Congress's prohibition on FERC's authority to order retail wheeling and gives the agency much greater scope to issue exactly that kind of order. Such an agency policy preference cannot possibly justify the Commission's departure from the plain text of Section 824k(h)(2).

    **2.** ***The Orders on appeal do not interpret the statutory text or set forth a reasonable reading.*** The Orders on appeal here simply echo the unreasonable and unsupported interpretation set forth in the *Suffolk County* orders.

    The Order states that "[t]he Commission has already interpreted the criteria of section 212(h)(2) in *Suffolk County*, and we follow the Commission's *Suffolk County* reasoning here." JA__ (Order ¶ 33). After describing the *Suffolk County* orders, the Order quickly moves on to trying to identify the potential "universe of grandfathered customers" under the class-based approach. JA__ (*id.* ¶ 38).

    The Rehearing Order says little more. That order asserts that the *Suffolk County* orders are "consistent with the text of" Section 824k(h)(2). JA__ (Rehearing Order ¶ 53); *see* JA__ (*id.* ¶ 49); JA__ (*id.* ¶¶ 56-58) (deeming legislative history irrelevant). But the order does not meaningfully discuss that text. It primarily lays out what the *Suffolk County* orders say, including recounting the Commission's irrelevant and baseless statement in those orders that it would somehow be "unfair"

to refuse to grandfather consumers who were not but perhaps *could have been* served by the relevant entity in October 1992.  JA__ (*id.* ¶¶ 53-54).[11]

Beyond that, the Rehearing Order defends the class-based approach in only one inapt way:  by asserting that such an approach might not increase the total amount or scope of service that San Francisco was providing to all of its consumers on October 24, 1992.  JA__ (*id.* ¶ 55) ("[I]f another customer had moved into a location San Francisco had served after October 24, 1992, but San Francisco otherwise provided similar service to that different customer, the 'ultimate consumer' has not changed meaningfully the kind of load San Francisco has served within that class of customers.");  JA__ (*id.* ¶ 59).  That assertion is a dubious one; it is based on speculation about how many consumers may have been in certain broad Commission-selected "classes" in October 1992 and how many consumers might be in those same classes now or in the future.  But even if the Commission were right (and it is not), Section 824k(h)(2) still says *nothing* about total amount or kind of service being provided, or about whether grandfathering would increase the burden

---

[11] The Rehearing Order also intimates that by agreeing to Tariff language referencing Section 824k(h)(2) or by agreeing that FERC should interpret that language, PG&E agreed to what the *Suffolk County* orders say.  JA__ (Rehearing Order ¶¶ 39-41). That is wrong.  The Tariff incorporates the criteria of the *statute*, not a particular Commission misreading of that statute.  And PG&E has at all times contended (and FERC staff concurred, JA__) that the *Suffolk County* orders—which do not bind the Commission as prior precedent can bind a court—are incorrect.

on the utility being required to wheel power to an entity like San Francisco. Rather, that provision asks only whether the entity proposes to provide service to the *same* "ultimate consumer" to which the entity was "providing electric service . . . on October 24, 1992," 16 U.S.C. § 824k(h)(2)—and answering that question by pointing to total amounts or kinds of service provided at various times is a *non sequitur*.

> **3.    *The Commission's apparent belief that this Court's prior decision dictated the class-based approach is incorrect.*** At points, the Orders suggest that the Commission believed that this Court's prior decision in this case somehow required the Commission to adopt the *Suffolk County* orders' class-based approach to Section 824k(h)(2) and grandfather consumers not receiving service from San Francisco on October 24, 1992. *E.g.*, JA__ (Order ¶¶ 31, 33). That is wrong.

This Court's prior decision makes clear that the Court was not itself engaging in any interpretation of Section 824k(h)(2). This Court stated that the underlying Commission orders that the Court was considering in that appeal had specifically *declined* to interpret Section 824k(h)(2). 24 F.4th at 663-64; JA__ (Order ¶ 32). The Court decided that the Commission had erred in failing to interpret that provision given the Tariff's reference to it, but remanded for the Commission to undertake the interpretive task in the first instance. 24 F.4th at 664; JA__ (Order ¶ 32).

Moreover, where this Court in passing expressed any view about the meaning of Section 824k(h)(2), that view is *not consistent* with the approach that the Commission took here—which helps emphasize the degree to which the Commission has departed from any "natural reading," *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019), of the plain text of that provision. In describing one of San Francisco's arguments, the Court stated that "[a]ny end-use customers San Francisco did not serve in 1992 could not qualify" for grandfathering. 24 F.4th at 664. That statement is consistent with the statutory language, but does not accord with the broader approach that the Commission adopted on remand at San Francisco's urging. This Court also described the *Suffolk County* orders as "allow[ing] grandfathering of a customer San Francisco *served*" on October 24, 1992, *id.* at 665 (emphasis added), suggesting that the Court assumed that "class" as used in *Suffolk County* referred to the fixed set of consumers who *actually* received service on October 24, 1992, rather than to a vaguely conceptualized category of consumer.

### C.    No Deference Is Warranted

For multiple reasons, no deference is warranted to the Commission's class-based approach to Section 824k(h)(2)—or to the Commission's interpretation of the Tariff, which turned on the statutory-interpretation question.

First, for the reasons discussed above, the Commission's class-based approach is irreconcilable with the plain language of the statute. Section 824k(h)(2) is clear that grandfathering is available only as to *specific consumers* to which the entity seeking retail wheeling was providing service on October 24, 1992, and it is impossible to understand that provision to grandfather *additional* consumers who do not meet that requirement simply because they may have some characteristics in common with consumers who were actually being served by the entity on the relevant date. *See* pp.22-46, *supra*. In the absence of any statutory ambiguity, Congress's command must govern. *See, e.g.*, *Chamber of Com. v. FEC*, 76 F.3d 1234, 1235 (D.C. Cir. 1996); *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468-71 (2001).

Second, even if there were any ambiguity in Section 824k(h)(2) on the key issue (and there is not), it remains true that no deference is warranted. The Commission's reading of Section 824k(h)(2), which has no anchor in the text of the statute, is not within the realm of reasonableness. *See* pp.37-46, *supra*; *Chamber of Com.*, 76 F.3d at 1235 (no *Chevron* deference unless agency's interpretation is reasonable). But even if it were a reasonable reading, this Court *still* should not defer because the class-based approach is not the *most* reasonable reading of the statute. As the Supreme Court recently emphasized, judges must "exhaust all the textual and structural clues bearing on" a statute's "meaning"—and if the court can

then "resolve the interpretive question," its "sole function" is "to apply" the resulting interpretation, "not [to] defer to some conflicting reading the government might advance." *Niz-Chavez*, 141 S. Ct. at 1480 (citations omitted); *see, e.g.*, *AHA v. Becerra*, 142 S. Ct. 1896, 1906 (2022) (reversing this Court's deference to agency statutory interpretation as reasonable, where Supreme Court itself "employ[ed] the traditional tools of statutory interpretation" and did "not agree with [the agency's] interpretation").    Exhausting all of the clues here cannot possibly yield the conclusion that the Commission's class-based approach is superior to a straightforward reading of the text of Section 824k(h)(2). *See* pp.22-46, *supra*.

Third, no deference is warranted, regardless of whether the statutory language is clear, because FERC made no attempt in its orders in this case (or in the *Suffolk County* orders) to analyze the plain text of the statute and explain why a class-based approach is a reasonable reading. As discussed above, the Order conclusorily—and without any interpretation of the statutory language—states that the Commission will continue to follow the interpretation set forth in the *Suffolk County* orders. *See* pp.43-45, *supra*. And although the Rehearing Order purports to address the statute's language, JA__ (Rehearing Order ¶ 53), that order actually does no such thing: it just parrots the policy-based reasoning of the *Suffolk County* orders and makes irrelevant statements about whether expansive grandfathering would increase the amount or kind of service to consumers in a particular area. *See* pp.43-45, *supra*.

The Commission cannot claim deference here for a supposed statutory "interpretation" that the agency never actually carried out. *See, e.g.*, *Council for Urological Ints. v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015) ("post-hoc rationalizations" not permissible basis for *Chevron* deference).

Finally, PG&E respectfully preserves the argument that *Chevron* should be overruled or further limited. *See Loper Bright Enterprises v. Raimondo*, S. Ct. No. 22-451 (granting certiorari). Agencies cannot be permitted to "dictate the outcome" of proceedings through "erroneous interpretations," *Baldwin v. United States*, 140 S. Ct. 690, 692 (2020) (Thomas, J., dissenting from denial), thereby arrogating to themselves powers that properly belong to other branches of government.

### D. Vacatur Is Necessary So That The Commission Can Interpret The Tariff With A Correct Understanding Of Section 824k(h)(2)

Because the Commission based its interpretation of the Tariff on a class-based approach to Section 824k(h)(2) that is contrary to the statutory text, the Commission had no occasion to decide how the Tariff should be understood in light of a correct interpretation of Section 824k(h)(2).

That is a job for the Commission in the first instance. *See, e.g.*, *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (where "agency made an error of law, the court's inquiry is at an end" and remand "for further action consistent with the corrected legal standards" is required). On remand, the Commission will have to set aside its statutorily irrelevant analysis of "classes" of

consumers.  The Commission also will have to interpret the Tariff, which states that San Francisco "must provide evidence demonstrating that, for each Point of Delivery for which it claims eligibility for Grandfathering, the criteria of 16 USC § 824k(h)(2) are met."  JA__ (Tariff § 14.2).  In the Orders here, the Commission concluded that "limiting eligibility for grandfathering to specific delivery points receiving service on October 24, 1992 would contravene *Suffolk County* . . . because it would have the same effect as restricting the grandfathering provision to individual retail customers actually receiving service on October 24, 1992, rather than the class of customers eligible to receive service from San Francisco on October 24, 1992."  JA__ (Rehearing Order ¶ 61); *see* JA__ (Order ¶ 36).  Once the class-based approach of *Suffolk County* is set aside as contrary to the statute, however, that reasoning no longer applies.  Accordingly, the Commission will have to address and give meaning to the Tariff's "Point of Delivery" language and harmonize it with the Tariff's reference to Section 824k(h)(2)'s grandfathering exception.

## II.    The Orders Are Arbitrary And Capricious

Vacatur also is warranted on independent grounds because the Orders are arbitrary and capricious.

The Commission's interpretation of Section 824k(h)(2), and its consequent interpretation of the Tariff, is not only contrary to the plain language of the relevant provisions but also is arbitrary and capricious.  There is no possible interpretation of

Section 824k(h)(2) under which the statute *dictates* a class-based approach, especially given that the word "class" (or its equivalent) does not appear anywhere in the relevant provision. And the Commission has never adequately explained the basis for its conclusion that a class-based approach is a sensible way to implement Congress's command. Indeed, it appears that the class-based approach developed from a sort of game of Commission "telephone" in which each *Suffolk County* order expanded the scope of grandfathering by overreading the prior order in the sequence. *See* pp.37-43, *supra*. Accordingly, the Orders "reflect[] a lack of reasoned decisionmaking" as to adoption of the class-based approach. *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 460 (D.C. Cir. 2000); *see id.* (arbitrary where agency "*asserted*" that certain "capabilities [were] required" by the relevant statute but "never explained" the "basis for this conclusion" or addressed "key statutory terms"); *see also Am. Radio Relay League v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) (arbitrary to fail "to consider responsible alternatives to [agency's] chosen policy and to give a reasoned explanation" for "reject[ing]" them).

Even assuming that the class-based approach were supportable despite its conflict with the statutory language and its fundamental arbitrariness, the Orders are nevertheless arbitrary and capricious on several grounds. First, although the class-based approach is the linchpin of the Commission's analysis, the Commission failed to provide any reasoned explanation of how to define the parameters of a "class" for

grandfathering purposes.  The Commission did not provide any rule, standard, or other test for identifying a class; explain the kinds of characteristics that ultimate consumers who received service in October 1992 and ultimate consumers who did not receive such service at that time must have in common to be categorized as part of the same class; or otherwise address what "class" actually means in this context. *E.g.*, pp.32-33, *supra*.  And the *Suffolk County* orders shed no additional light on those matters.  *See* p.37-43, *supra*.  That absence of analysis is especially arbitrary because it is inherently difficult to identify a relevant class for grandfathering purposes.  Attempting to do so presents a paradigmatic "level of generality" problem:  one might narrowly define a class as all consumers with characteristics identical to consumers who received service in October 1992; much more broadly define a class as all consumers with characteristics very roughly comparable to the characteristics of consumers who received service in October 1992; or something in between.  *See Hubbell*, 167 F.3d at 578 ("categories do not present themselves as Platonic forms with inherent shape or universal meaning" but rather "can be abstracted upwards or downwards (through varying levels of generality)").

The Commission's own difficulties in trying to identify the relevant "classes" in this case are telling.  The Commission struggled to identify the relevant classes and never did so clearly (even after modifying its decision as to that issue on rehearing).  JA__ (Order ¶¶ 38-40); JA__ (Rehearing Order ¶¶ 68-69).  Indeed, the

Commission ultimately resorted to referring to preexisting documents that the parties did not create for the purpose of trying to define a class under the grandfathering provision; that are ill suited for that purpose given the breadth and opacity of the categories they discuss; and that may well not exist in any other case, even though (if this Court were to bless it) the class-based approach would presumably apply in numerous cases going forward.  *See id*.  For example, the Commission said that one possible "class" of grandfathered consumers here is "entities providing services on behalf of or in coordination with the city."  JA__ (Order ¶ 40).  On its face, such an ill-defined "class" could encompass a vast array of entities, essentially on San Francisco's say-so, and therefore could render the grandfathering exception all-encompassing.  The Commission also separately stated that so-called "unmetered load" was a "class" of consumers that was grandfathered under the class-based approach.  But the term "unmetered load" refers to a certain type of technical *interconnection* (where meters are not used, as with streetlights) and not to *consumers* that are purchasers of unmetered "electric energy."  16 U.S.C. § 824k(h); *see* JA__, __ (Order ¶ 40 nn.34, 59).

In short, there is no basis for the Commission's unexplained, vague, and easily manipulable approach to deciding the parameters of a "class" in this context.  That lack of rationality renders the Orders impermissibly arbitrary.  *See, e.g.*, *Baltimore Gas & Elec. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) (agency must explain

what "rules require" and administer them "across cases" in a "reasonably predictable and coherent" way); *Rapoport v. SEC*, 682 F.3d 98, 107 (D.C. Cir. 2012) (action "must not be 'vague and indecisive'") (citation omitted); *Sw. Power Pool v. FERC*, 736 F.3d 994, 997 (D.C. Cir. 2013).

Second, the Orders do not provide a reasoned explanation of how the Commission's interpretation of the Tariff gives meaning to the Tariff language requiring San Francisco to demonstrate that, "for each *Point of Delivery* for which it claims eligibility for Grandfathering, the criteria of 16 USC § 824k(h)(2) are met." JA__ (Tariff § 14.2) (emphasis added). Identifying the "criteria" of Section 824k(h)(2) is unquestionably an important part of deciding what the Tariff means; this Court has already said so. 24 F.4th at 663-64. But that is not the *only* analysis required in deciding what the Tariff means. The criteria must be met for "Point[s] of Delivery," and a Point of Delivery is not a consumer; it is a physical location where power is provided to an ultimate consumer. JA__, __ (Tariff §§ 2.29, 14.2).

Here, in interpreting the Tariff the Commission did not reach a reasoned, coherent decision about how the class-based approach and the Tariff's reference to "Point[s] of Delivery" interact with each other. The Commission seemed to be under the misimpression that this Court's prior decision had instructed the Commission to largely disregard the "Points of Delivery" language. JA__ (Rehearing Order ¶¶ 42-43). But that is not an accurate reading of that decision, which simply concluded

54

that an analysis of Section 824k(h)(2) is one indispensable part of the interpretive task and that the Commission had erred by not previously undertaking it. *Compare* 24 F.4th at 663-64, *with* JA__ (Rehearing Order ¶ 43) (asserting that this Court had affirmatively "found it possible to harmonize the point of delivery language in [Tariff] [S]ection 14.2 with its reference to" Section 824k(h)(2)). The Commission's misreading of this Court's decision is in and of itself unreasonable. *Cf. Jacoby v. NLRB*, 233 F.3d 611, 614 (D.C. Cir. 2000).

Even beyond that, however, the Commission did not grapple with the "Point of Delivery" language except in a conclusory and illogical way. The Orders' discussion of that language essentially amounts to the repeated statement that grandfathering applies if San Francisco can "demonstrate that each point of delivery falls into a 'class of customer' served by San Francisco on October 24, 1992." JA__ (Rehearing Order ¶ 42); *see* JA__ , __ (*id.* ¶¶ 40, 43). But that statement does not make sense, because a Point of Delivery is not a consumer. *See Baltimore Gas*, 954 F.3d at 286 (analysis that is not "reasonable and coherent" is arbitrary); *ANR Storage v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018) ("internally inconsistent" analysis is arbitrary). The Commission's failure to give a reasoned explanation of how it harmonized its class-based approach to Section 824k(h)(2) with the "Point of Delivery" language in the Tariff, or to explain adequately why it abandoned its prior conclusion (before this Court's remand) that the "Point of Delivery" language was

absolutely central to the inquiry, *see, e.g.*, 24 F.4th at 663, is unreasonable. *See, e.g.*, *Omnipoint v. FCC*, 78 F.3d 620, 632 (D.C. Cir. 1996); *W. Deptford Energy v. FERC*, 766 F.3d 10, 22 (D.C. Cir. 2014); *SFPP v. FERC*, 967 F.3d 788, 795 (D.C. Cir. 2020).

## CONCLUSION

This Court should grant the petitions and vacate the Orders.

Dated August 29, 2023

Respectfully submitted,

/s/ Elaine J. Goldenberg

Joshua S Levenberg
Alexandra J. Ward
PACIFIC GAS AND ELECTRIC COMPANY
300 Lakeside Dr.
Oakland, CA 94612
(415) 973-5970
Joshua.Levenberg@pge.com
Ali.Ward@pge.com

Elaine J. Goldenberg
Helen E. White
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW,
  Suite 500E
Washington, DC 20001-5369
(202) 220-1100
Elaine.Goldenberg@mto.com

Henry Weissmann
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
(213) 683-9100
Henry.Weissmann@mto.com

*Counsel for Petitioner*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g) of the Federal Rules of Appellant Procedure, the undersigned counsel hereby certifies that this brief complies with the type volume limitation of Rule 32(a)(7)(B).  As measured by the word-processing system used to prepare this brief, there are 12,998 words in the brief excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1).

Dated:  August 29, 2023              */s/ Elaine J. Goldenberg*
                                     Elaine J. Goldenberg

## CERTIFICATE OF SERVICE

I certify that on August 29, 2023, a true and correct copy of this Appellees'
Brief was filed via the Court's electronic filing system, which will forward a copy
to all counsel of record.  I certify that all participants in this case are registered
CM/ECF users.

Dated:  August 29, 2023                    */s/ Elaine J. Goldenberg*
                                           Elaine J. Goldenberg

**ADDENDUM**

# TABLE OF CONTENTS

16 U.S.C. § 824k ................................................................................A1

16 U.S.C. § 2621 ..............................................................................A11

## 16 U.S.C.A. § 824k
Orders requiring interconnection or wheeling

**(a) Rates, charges, terms, and conditions for wholesale transmission services**

An order under section 824j of this title shall require the transmitting utility subject to the order to provide wholesale transmission services at rates, charges, terms, and conditions which permit the recovery by such utility of all the costs incurred in connection with the transmission services and necessary associated services, including, but not limited to, an appropriate share, if any, of legitimate, verifiable and economic costs, including taking into account any benefits to the transmission system of providing the transmission service, and the costs of any enlargement of transmission facilities. Such rates, charges, terms, and conditions shall promote the economically efficient transmission and generation of electricity and shall be just and reasonable, and not unduly discriminatory or preferential. Rates, charges, terms, and conditions for transmission services provided pursuant to an order under section 824j of this title shall ensure that, to the extent practicable, costs incurred in providing the wholesale transmission services, and properly allocable to the provision of such services, are recovered from the applicant for such order and not from a transmitting utility's existing wholesale, retail, and transmission customers.

**(b) Repealed. Pub.L. 102-486, Title VII, § 722(1), Oct. 24, 1992, 106 Stat. 2916**

**(c) Issuance of proposed order; agreement by parties to terms and conditions of order; approval by Commission; inclusion in final order; failure to agree**

**(1)** Before issuing an order under section 824i of this title or subsection (a) or (b) of section 824j of this title, the Commission shall issue a proposed order and set a reasonable time for parties to the proposed interconnection or transmission order to agree to terms and conditions under which such order is to be carried out, including the apportionment of costs between them and the compensation or reimbursement reasonably due to any of them. Such proposed order shall not be reviewable or enforceable in any court. The time set for such parties to agree to such terms and conditions may be shortened if the Commission determines that delay would jeopardize the attainment of the purposes of any proposed order. Any terms and conditions agreed to by the parties shall be subject to the approval of the Commission.

**(2)(A)** If the parties agree as provided in paragraph (1) within the time set by the Commission and the Commission approves such agreement, the terms and conditions shall be included in the final order. In the case of an order under section 824i of this title, if the parties fail to agree within the time set by the Commission or if the Commission does not approve any such agreement, the Commission shall prescribe such terms and conditions and include such terms and conditions in the final order.

**(B)** In the case of any order applied for under section 824j of this title, if the parties fail to agree within the time set by the Commission, the Commission shall prescribe such terms and conditions in the final order.

**(d) Statement of reasons for denial**

If the Commission does not issue any order applied for under section 824i or 824j of this title, the Commission shall, by order, deny such application and state the reasons for such denial.

**(e) Savings provisions**

**(1)** No provision of section 824i, 824j, 824m of this title, or this section shall be treated as requiring any person to utilize the authority of any such section in lieu of any other authority of law. Except as provided in section 824i, 824j, 824m of this title, or this section, such sections shall not be construed as limiting or impairing any authority of the Commission under any other provision of law.

**(2)** Sections 824i, 824j, 824*l*, 824m of this title, and this section, shall not be construed to modify, impair, or supersede the antitrust laws. For purposes of this section, the term "antitrust laws" has the meaning given in subsection (a) of the first sentence of section 12 of Title 15, except that such term includes section 45 of Title 15 to the extent that such section relates to unfair methods of competition.

**(f) Effective date of order; hearing; notice; review**

**(1)** No order under section 824i or 824j of this title requiring the Tennessee Valley Authority (hereinafter in this subsection referred to as the "TVA") to take any action shall take effect for 60 days following the date of issuance of the order. Within 60 days following the issuance by the Commission of any order under section 824i or of section 824j of this title requiring the TVA to enter into any contract for the sale or delivery of

A3

power, the Commission may on its own motion initiate, or upon petition of any aggrieved person shall initiate, an evidentiary hearing to determine whether or not such sale or delivery would result in violation of the third sentence of section 15d(a) of the Tennessee Valley Authority Act of 1933 (16 U.S.C. 831n-4), hereinafter in this subsection referred to as the TVA Act.

**(2)** Upon initiation of any evidentiary hearing under paragraph (1), the Commission shall give notice thereof to any applicant who applied for and obtained the order from the Commission, to any electric utility or other entity subject to such order, and to the public, and shall promptly make the determination referred to in paragraph (1). Upon initiation of such hearing, the Commission shall stay the effectiveness of the order under section 824i or 824j of this title until whichever of the following dates is applicable--

**(A)** the date on which there is a final determination (including any judicial review thereof under paragraph (3)) that no such violation would result from such order, or

**(B)** the date on which a specific authorization of the Congress (within the meaning of the third sentence of section 15d(a) of the TVA Act) takes effect.

**(3)** Any determination under paragraph (1) shall be reviewable only in the appropriate court of the United States upon petition filed by any aggrieved person or municipality within 60 days after such determination, and such court shall have jurisdiction to grant appropriate relief. Any applicant who applied for and obtained the order under section 824i or 824j of this title, and any electric utility or other entity subject to such order shall have the right to intervene in any such proceeding in such court. Except for review

A4

by such court (and any appeal or other review by an appellate court of the United States), no court shall have jurisdiction to consider any action brought by any person to enjoin the carrying out of any order of the Commission under section 824i or section 824j of this title requiring the TVA to take any action on the grounds that such action requires a specific authorization of the Congress pursuant to the third sentence of section 15d(a) of the TVA Act.

**(g) Prohibition on orders inconsistent with retail marketing areas**

No order may be issued under this chapter which is inconsistent with any State law which governs the retail marketing areas of electric utilities.

**(h) Prohibition on mandatory retail wheeling and sham wholesale transactions**

No order issued under this chapter shall be conditioned upon or require the transmission of electric energy:

**(1)** directly to an ultimate consumer, or

**(2)** to, or for the benefit of, an entity if such electric energy would be sold by such entity directly to an ultimate consumer, unless:

**(A)** such entity is a Federal power marketing agency; the Tennessee Valley Authority; a State or any political subdivision of a State (or an agency, authority, or instrumentality of a State or a political subdivision); a corporation or association that has ever received a loan for the purposes of providing electric service from the Administrator of the Rural Electrification Administration under the Rural Electrification Act of 1936; a person having an obligation arising under State or local

A5

law (exclusive of an obligation arising solely from a contract entered into by such person) to provide electric service to the public; or any corporation or association which is wholly owned, directly or indirectly, by any one or more of the foregoing; and

**(B)** such entity was providing electric service to such ultimate consumer on October 24, 1992, or would utilize transmission or distribution facilities that it owns or controls to deliver all such electric energy to such electric consumer.

Nothing in this subsection shall affect any authority of any State or local government under State law concerning the transmission of electric energy directly to an ultimate consumer.

**(i) Laws applicable to Federal Columbia River Transmission System**

**(1)** The Commission shall have authority pursuant to section 824i of this title, section 824j of this title, this section, and section 824*l* of this title to (A) order the Administrator of the Bonneville Power Administration to provide transmission service and (B) establish the terms and conditions of such service. In applying such sections to the Federal Columbia River Transmission System, the Commission shall assure that--

**(i)** the provisions of otherwise applicable Federal laws shall continue in full force and effect and shall continue to be applicable to the system; and

**(ii)** the rates for the transmission of electric power on the system shall be governed only by such otherwise applicable provisions of law and not by any provision of section 824i of this title, section 824j of this title, this section, or section 824*l* of this title, except that no rate for the transmission of power on the system shall be unjust,

A6

unreasonable, or unduly discriminatory or preferential, as determined by the Commission.

**(2)** Notwithstanding any other provision of this chapter with respect to the procedures for the determination of terms and conditions for transmission service--

**(A)** when the Administrator of the Bonneville Power Administration either (i) in response to a written request for specific transmission service terms and conditions does not offer the requested terms and conditions, or (ii) proposes to establish terms and conditions of general applicability for transmission service on the Federal Columbia River Transmission System, then the Administrator may provide opportunity for a hearing and, in so doing, shall--

**(I)** give notice in the Federal Register and state in such notice the written explanation of the reasons why the specific terms and conditions for transmission services are not being offered or are being proposed;

**(II)** adhere to the procedural requirements of paragraphs (1) through (3) of section 839e(i) of this title, except that the hearing officer shall, unless the hearing officer becomes unavailable to the agency, make a recommended decision to the Administrator that states the hearing officer's findings and conclusions, and the reasons or basis thereof, on all material issues of fact, law, or discretion presented on the record; and

**(III)** make a determination, setting forth the reasons for reaching any findings and conclusions which may differ from those of the hearing officer, based on the

hearing record, consideration of the hearing officer's recommended decision, section 824j of this title and this section, as amended by the Energy Policy Act of 1992, and the provisions of law as preserved in this section; and

**(B)** if application is made to the Commission under section 824j of this title for transmission service under terms and conditions different than those offered by the Administrator, or following the denial of a request for transmission service by the Administrator, and such application is filed within 60 days of the Administrator's final determination and in accordance with Commission procedures, the Commission shall--

**(i)** in the event the Administrator has conducted a hearing as herein provided for (I) accord parties to the Administrator's hearing the opportunity to offer for the Commission record materials excluded by the Administrator from the hearing record, (II) accord such parties the opportunity to submit for the Commission record comments on appropriate terms and conditions, (III) afford those parties the opportunity for a hearing if and to the extent that the Commission finds the Administrator's hearing record to be inadequate to support a decision by the Commission, and (IV) establish terms and conditions for or deny transmission service based on the Administrator's hearing record, the Commission record, section 824j of this title and this section, as amended by the Energy Policy Act of 1992, and the provisions of law as preserved in this section, or

A8

(ii) in the event the Administrator has not conducted a hearing as herein provided for, determine whether to issue an order for transmission service in accordance with section 824j of this title and this section, including providing the opportunity for a hearing.

(3) Notwithstanding those provisions of section 825*l*(b) of this title which designate the court in which review may be obtained, any party to a proceeding concerning transmission service sought to be furnished by the Administrator of the Bonneville Power Administration seeking review of an order issued by the Commission in such proceeding shall obtain a review of such order in the United States Court of Appeals for the Pacific Northwest, as that region is defined by section 839a(14) of this title.

(4) To the extent the Administrator of the Bonneville Power Administration cannot be required under section 824j of this title, as a result of the Administrator's other statutory mandates, either to (A) provide transmission service to an applicant which the Commission would otherwise order, or (B) provide such service under rates, terms, and conditions which the Commission would otherwise require, the applicant shall not be required to provide similar transmission services to the Administrator or to provide such services under similar rates, terms, and conditions.

(5) The Commission shall not issue any order under section 824i of this title, section 824j of this title, this section, or section 824*l* of this title requiring the Administrator of the Bonneville Power Administration to provide transmission service if such an order would impair the Administrator's ability to provide such transmission service to the

Administrator's power and transmission customers in the Pacific Northwest, as that region is defined in section 839a(14) of this title, as is needed to assure adequate and reliable service to loads in that region.

**(j) Equitability within territory restricted electric systems**

With respect to an electric utility which is prohibited by Federal law from being a source of power supply, either directly or through a distributor of its electric energy, outside an area set forth in such law, no order issued under section 824j of this title may require such electric utility (or a distributor of such electric utility) to provide transmission services to another entity if the electric energy to be transmitted will be consumed within the area set forth in such Federal law, unless the order is in furtherance of a sale of electric energy to that electric utility: Provided, however, That the foregoing provision shall not apply to any area served at retail by an electric transmission system which was such a distributor on October 24, 1992, and which before October 1, 1991, gave its notice of termination under its power supply contract with such electric utility.

**(k) ERCOT utilities**

**(1) Rates**

Any order under section 824j of this title requiring provision of transmission services in whole or in part within ERCOT shall provide that any ERCOT utility which is not a public utility and the transmission facilities of which are actually used for such transmission service is entitled to receive compensation based, insofar as practicable and consistent with subsection (a), on the transmission ratemaking methodology used by the Public Utility Commission of Texas.

**(2) Definitions**

For purposes of this subsection--

**(A)** the term "ERCOT" means the Electric Reliability Council of Texas; and

**(B)** the term "ERCOT utility" means a transmitting utility which is a member of ERCOT.

**16 U.S.C. § 2621**

**Consideration and determination respecting certain ratemaking standards**

Effective: November 15, 2021

**(a) Consideration and determination**

Each State regulatory authority (with respect to each electric utility for which it has ratemaking authority) and each nonregulated electric utility shall consider each standard established by subsection (d) and make a determination concerning whether or not it is appropriate to implement such standard to carry out the purposes of this chapter. For

purposes of such consideration and determination in accordance with subsections (b) and

(c), and for purposes of any review of such consideration and determination in any court

in accordance with section 2633 of this title, the purposes of this chapter supplement

otherwise applicable State law. Nothing in this subsection prohibits any State regulatory

authority or nonregulated electric utility from making any determination that it is not

appropriate to implement any such standard, pursuant to its authority under otherwise

applicable State law.

**(b) Procedural requirements for consideration and determination**

**(1)** The consideration referred to in subsection (a) shall be made after public notice and

hearing. The determination referred to in subsection (a) shall be--

**(A)** in writing,

**(B)** based upon findings included in such determination and upon the evidence

presented at the hearing, and

**(C)** available to the public.

**(2)** Except as otherwise provided in paragraph (1), in the second sentence of section

2622(a) of this title, and in sections 2631 and 2632 of this title, the procedures for the

consideration and determination referred to in subsection (a) shall be those established

by the State regulatory authority or the nonregulated electric utility.

A12

**(c) Implementation**

**(1)** The State regulatory authority (with respect to each electric utility for which it has ratemaking authority) or nonregulated electric utility may, to the extent consistent with otherwise applicable State law--

**(A)** implement any such standard determined under subsection (a) to be appropriate to carry out the purposes of this chapter, or

**(B)** decline to implement any such standard.

**(2)** If a State regulatory authority (with respect to each electric utility for which it has ratemaking authority) or nonregulated electric utility declines to implement any standard established by subsection (d) which is determined under subsection (a) to be appropriate to carry out the purposes of this chapter, such authority or nonregulated electric utility shall state in writing the reasons therefor. Such statement of reasons shall be available to the public.

**(3)** If a State regulatory authority implements a standard established by subsection (d)(7) or (8), such authority shall--

**(A)** consider the impact that implementation of such standard would have on small businesses engaged in the design, sale, supply, installation or servicing of energy conservation, energy efficiency or other demand side management measures, and

**(B)** implement such standard so as to assure that utility actions would not provide such utilities with unfair competitive advantages over such small businesses.

A13

**(d) Establishment**

The following Federal standards are hereby established:

**(1) Cost of service**

Rates charged by any electric utility for providing electric service to each class of electric consumers shall be designed, to the maximum extent practicable, to reflect the costs of providing electric service to such class, as determined under section 2625(a) of this title.

**(2) Declining block rates**

The energy component of a rate, or the amount attributable to the energy component in a rate, charged by any electric utility for providing electric service during any period to any class of electric consumers may not decrease as kilowatt-hour consumption by such class increases during such period except to the extent that such utility demonstrates that the costs to such utility of providing electric service to such class, which costs are attributable to such energy component, decrease as such consumption increases during such period.

**(3) Time-of-day rates**

The rates charged by any electric utility for providing electric service to each class of electric consumers shall be on a time-of-day basis which reflects the costs of providing electric service to such class of electric consumers at different times of the day unless such rates are not cost-effective with respect to such class, as determined under section 2625(b) of this title.

A14

**(4) Seasonal rates**

The rates charged by an electric utility for providing electric service to each class of electric consumers shall be on a seasonal basis which reflects the costs of providing service to such class of consumers at different seasons of the year to the extent that such costs vary seasonally for such utility.

**(5) Interruptible rates**

Each electric utility shall offer each industrial and commercial electric consumer an interruptible rate which reflects the cost of providing interruptible service to the class of which such consumer is a member.

**(6) Load management techniques**

Each electric utility shall offer to its electric consumers such load management techniques as the State regulatory authority (or the nonregulated electric utility) has determined will--

**(A)** be practicable and cost-effective, as determined under section 2625(c) of this title,

**(B)** be reliable, and

**(C)** provide useful energy or capacity management advantages to the electric utility.

**(7) Integrated resource planning**

Each electric utility shall employ integrated resource planning. All plans or filings before a State regulatory authority to meet the requirements of this paragraph must be

A15

updated on a regular basis, must provide the opportunity for public participation and comment, and contain a requirement that the plan be implemented.

**(8) Investments in conservation and demand management**

The rates allowed to be charged by a State regulated electric utility shall be such that the utility's investment in and expenditures for energy conservation, energy efficiency resources, and other demand side management measures are at least as profitable, giving appropriate consideration to income lost from reduced sales due to investments in and expenditures for conservation and efficiency, as its investments in and expenditures for the construction of new generation, transmission, and distribution equipment. Such energy conservation, energy efficiency resources and other demand side management measures shall be appropriately monitored and evaluated.

**(9) Energy efficiency investments in power generation and supply**

The rates charged by any electric utility shall be such that the utility is encouraged to make investments in, and expenditures for, all cost-effective improvements in the energy efficiency of power generation, transmission and distribution. In considering regulatory changes to achieve the objectives of this paragraph, State regulatory authorities and nonregulated electric utilities shall consider the disincentives caused by existing ratemaking policies, and practices, and consider incentives that would encourage better maintenance, and investment in more efficient power generation, transmission and distribution equipment.

A16

**(10) Consideration of the effects of wholesale power purchases on utility cost of capital; effects of leveraged capital structures on the reliability of wholesale power sellers; and assurance of adequate fuel supplies**

**(A)** To the extent that a State regulatory authority requires or allows electric utilities for which it has ratemaking authority to consider the purchase of long-term wholesale power supplies as a means of meeting electric demand, such authority shall perform a general evaluation of:

**(i)** the potential for increases or decreases in the costs of capital for such utilities, and any resulting increases or decreases in the retail rates paid by electric consumers, that may result from purchases of long-term wholesale power supplies in lieu of the construction of new generation facilities by such utilities;

**(ii)** whether the use by exempt wholesale generators (as defined in section 79z-5a[1] of Title 15) of capital structures which employ proportionally greater amounts of debt than the capital structures of such utilities threatens reliability or provides an unfair advantage for exempt wholesale generators over such utilities;

**(iii)** whether to implement procedures for the advance approval or disapproval of the purchase of a particular long-term wholesale power supply; and

**(iv)** whether to require as a condition for the approval of the purchase of power that there be reasonable assurances of fuel supply adequacy.

**(B)** For purposes of implementing the provisions of this paragraph, any reference contained in this section to November 9, 1978, shall be deemed to be a reference to October 24, 1992.

**(C)** Notwithstanding any other provision of Federal law, nothing in this paragraph shall prevent a State regulatory authority from taking such action, including action with respect to the allowable capital structure of exempt wholesale generators, as such State regulatory authority may determine to be in the public interest as a result of performing evaluations under the standards of subparagraph (A).

**(D)** Notwithstanding section 2634 of this title and paragraphs (1) and (2) of section 2622(a) of this title, each State regulatory authority shall consider and make a determination concerning the standards of subparagraph (A) in accordance with the requirements of subsections (a) and (b) of this section, without regard to any proceedings commenced prior to October 24, 1992.

**(E)** Notwithstanding subsections (b) and (c) of section 2622 of this title, each State regulatory authority shall consider and make a determination concerning whether it is appropriate to implement the standards set out in subparagraph (A) not later than one year after October 24, 1992.

## (11) Net metering

Each electric utility shall make available upon request net metering service to any electric consumer that the electric utility serves. For purposes of this paragraph, the term "net metering service" means service to an electric consumer under which electric

A18

energy generated by that electric consumer from an eligible on-site generating facility and delivered to the local distribution facilities may be used to offset electric energy provided by the electric utility to the electric consumer during the applicable billing period.

**(12) Fuel sources**

Each electric utility shall develop a plan to minimize dependence on 1 fuel source and to ensure that the electric energy it sells to consumers is generated using a diverse range of fuels and technologies, including renewable technologies.

**(13) Fossil fuel generation efficiency**

Each electric utility shall develop and implement a 10-year plan to increase the efficiency of its fossil fuel generation.

**(14) Time-based metering and communications**

**(A)** Not later than 18 months after August 8, 2005, each electric utility shall offer each of its customer classes, and provide individual customers upon customer request, a time-based rate schedule under which the rate charged by the electric utility varies during different time periods and reflects the variance, if any, in the utility's costs of generating and purchasing electricity at the wholesale level. The time-based rate schedule shall enable the electric consumer to manage energy use and cost through advanced metering and communications technology.

**(B)** The types of time-based rate schedules that may be offered under the schedule referred to in subparagraph (A) include, among others--

A19

**(i)** time-of-use pricing whereby electricity prices are set for a specific time period on an advance or forward basis, typically not changing more often than twice a year, based on the utility's cost of generating and/or purchasing such electricity at the wholesale level for the benefit of the consumer. Prices paid for energy consumed during these periods shall be pre-established and known to consumers in advance of such consumption, allowing them to vary their demand and usage in response to such prices and manage their energy costs by shifting usage to a lower cost period or reducing their consumption overall;

**(ii)** critical peak pricing whereby time-of-use prices are in effect except for certain peak days, when prices may reflect the costs of generating and/or purchasing electricity at the wholesale level and when consumers may receive additional discounts for reducing peak period energy consumption;

**(iii)** real-time pricing whereby electricity prices are set for a specific time period on an advanced or forward basis, reflecting the utility's cost of generating and/or purchasing electricity at the wholesale level, and may change as often as hourly; and

**(iv)** credits for consumers with large loads who enter into pre-established peak load reduction agreements that reduce a utility's planned capacity obligations.

**(C)** Each electric utility subject to subparagraph (A) shall provide each customer requesting a time-based rate with a time-based meter capable of enabling the utility and customer to offer and receive such rate, respectively.

**(D)** For purposes of implementing this paragraph, any reference contained in this section to November 9, 1978, shall be deemed to be a reference to August 8, 2005.

**(E)** In a State that permits third-party marketers to sell electric energy to retail electric consumers, such consumers shall be entitled to receive the same time-based metering and communications device and service as a retail electric consumer of the electric utility.

**(F)** Notwithstanding subsections (b) and (c) of section 2622 of this title, each State regulatory authority shall, not later than 18 months after August 8, 2005, conduct an investigation in accordance with section 2625(i) of this title and issue a decision whether it is appropriate to implement the standards set out in subparagraphs (A) and (C).

## (15) Interconnection

Each electric utility shall make available, upon request, interconnection service to any electric consumer that the electric utility serves. For purposes of this paragraph, the term "interconnection service" means service to an electric consumer under which an on-site generating facility on the consumer's premises shall be connected to the local distribution facilities. Interconnection services shall be offered based upon the standards developed by the Institute of Electrical and Electronics Engineers: IEEE Standard 1547 for Interconnecting Distributed Resources with Electric Power Systems, as they may be amended from time to time. In addition, agreements and procedures shall be established whereby the services are offered shall promote current best practices of interconnection

A21

for distributed generation, including but not limited to practices stipulated in model codes adopted by associations of state regulatory agencies. All such agreements and procedures shall be just and reasonable, and not unduly discriminatory or preferential.

**(16) Integrated resource planning**

Each electric utility shall--

    **(A)** integrate energy efficiency resources into utility, State, and regional plans; and

    **(B)** adopt policies establishing cost-effective energy efficiency as a priority resource.

**(17) Rate design modifications to promote energy efficiency investments**

    **(A) In general**

The rates allowed to be charged by any electric utility shall--

    **(i)** align utility incentives with the delivery of cost-effective energy efficiency; and

    **(ii)** promote energy efficiency investments.

    **(B) Policy options**

In complying with subparagraph (A), each State regulatory authority and each nonregulated utility shall consider--

    **(i)** removing the throughput incentive and other regulatory and management disincentives to energy efficiency;

    **(ii)** providing utility incentives for the successful management of energy efficiency programs;

A22

**(iii)** including the impact on adoption of energy efficiency as 1 of the goals of retail rate design, recognizing that energy efficiency must be balanced with other objectives;

**(iv)** adopting rate designs that encourage energy efficiency for each customer class;

**(v)** allowing timely recovery of energy efficiency-related costs; and

**(vi)** offering home energy audits, offering demand response programs, publicizing the financial and environmental benefits associated with making home energy efficiency improvements, and educating homeowners about all existing Federal and State incentives, including the availability of low-cost loans, that make energy efficiency improvements more affordable.

## (18) Consideration of smart grid investments

### (A) In general

Each State shall consider requiring that, prior to undertaking investments in nonadvanced grid technologies, an electric utility of the State demonstrate to the State that the electric utility considered an investment in a qualified smart grid system based on appropriate factors, including--

**(i)** total costs;

**(ii)** cost-effectiveness;

**(iii)** improved reliability;

**(iv)** security;

A23

**(v)** system performance; and

**(vi)** societal benefit.

**(B) Rate recovery**

Each State shall consider authorizing each electric utility of the State to recover from ratepayers any capital, operating expenditure, or other costs of the electric utility relating to the deployment of a qualified smart grid system, including a reasonable rate of return on the capital expenditures of the electric utility for the deployment of the qualified smart grid system.

**(C) Obsolete equipment**

Each State shall consider authorizing any electric utility or other party of the State to deploy a qualified smart grid system to recover in a timely manner the remaining book-value costs of any equipment rendered obsolete by the deployment of the qualified smart grid system, based on the remaining depreciable life of the obsolete equipment.

**(19) Smart grid information**

**(A) Standard**

All electricity purchasers shall be provided direct access, in written or electronic machine-readable form as appropriate, to information from their electricity provider as provided in subparagraph (B).

**(B) Information**

Information provided under this section, to the extent practicable, shall include:

A24

**(i) Prices**

Purchasers and other interested persons shall be provided with information on--

> **(I)** time-based electricity prices in the wholesale electricity market; and

> **(II)** time-based electricity retail prices or rates that are available to the purchasers.

**(ii) Usage**

Purchasers shall be provided with the number of electricity units, expressed in kwh, purchased by them.

**(iii) Intervals and projections**

Updates of information on prices and usage shall be offered on not less than a daily basis, shall include hourly price and use information, where available, and shall include a day-ahead projection of such price information to the extent available.

**(iv) Sources**

Purchasers and other interested persons shall be provided annually with written information on the sources of the power provided by the utility, to the extent it can be determined, by type of generation, including greenhouse gas emissions associated with each type of generation, for intervals during which such information is available on a cost-effective basis.

**(C) Access**

Purchasers shall be able to access their own information at any time through the Internet and on other means of communication elected by that utility for Smart Grid applications. Other interested persons shall be able to access information not specific to any purchaser through the Internet. Information specific to any purchaser shall be provided solely to that purchaser.

**(20) Demand-response practices**

**(A) In general**

Each electric utility shall promote the use of demand-response and demand flexibility practices by commercial, residential, and industrial consumers to reduce electricity consumption during periods of unusually high demand.

**(B) Rate recovery**

**(i) In general**

Each State regulatory authority shall consider establishing rate mechanisms allowing an electric utility with respect to which the State regulatory authority has ratemaking authority to timely recover the costs of promoting demand-response and demand flexibility practices in accordance with subparagraph (A).

**(ii) Nonregulated electric utilities**

A nonregulated electric utility may establish rate mechanisms for the timely recovery of the costs of promoting demand-response and demand flexibility practices in accordance with subparagraph (A).

**(21) Electric vehicle charging programs**

Each State shall consider measures to promote greater electrification of the transportation sector, including the establishment of rates that--

**(A)** promote affordable and equitable electric vehicle charging options for residential, commercial, and public electric vehicle charging infrastructure;

**(B)** improve the customer experience associated with electric vehicle charging, including by reducing charging times for light-, medium-, and heavy-duty vehicles;

**(C)** accelerate third-party investment in electric vehicle charging for light-, medium-, and heavy-duty vehicles; and

**(D)** appropriately recover the marginal costs of delivering electricity to electric vehicles and electric vehicle charging infrastructure.

## STATUTORY NOTES [to 16 U.S.C. § 2621]

## State Authorities; Construction

Nothing in amendment by section 712 of Pub.L. 102-486 to be construed as affecting or intending to affect, or in any way to interfere with, authority of any State or local government relating to environmental protection or siting of facilities, see section 731 of Pub.L. 102-486, set out as a note under 16 U.S.C.A. § 796.

## Wage Rate Requirements

For provisions relating to rates of wages to be paid to laborers and mechanics on projects for construction, alteration, or repair work funded under Div. D or an amendment by Div. D of Pub.L. 117-58, including authority of Secretary of Labor, see 42 U.S.C.A. § 18851.

**Report to President and Congress on Encouragement of Integrated Resource Planning and Investments in Conservation and Energy Efficiency by Electric Utilities**

Pub.L. 102-486, Title I, § 111(e), Oct. 24, 1992, 106 Stat. 2796, provided that: "Not later than 2 years after the date of the enactment of this Act [Oct. 24, 1992], the Secretary shall transmit a report to the President and to the Congress containing--

"**(1)** a survey of all State laws, regulations, practices, and policies under which State regulatory authorities implement the provisions of paragraphs (7), (8), and (9) of section 111(d) of the Public Utility Regulatory Policies Act of 1978 [pars. (7), (8), and (9) of subsec. (d) of this section];

"**(2)** an evaluation by the Secretary of whether and to what extent, integrated resource planning is likely to result in--

"**(A)** higher or lower electricity costs to an electric utility's ultimate consumers or to classes or groups of such consumers;

"**(B)** enhanced or reduced reliability of electric service; and

"**(C)** increased or decreased dependence on particular energy resources; and

"**(3)** a survey of practices and policies under which electric cooperatives prepare integrated resource plans, submit such plans to the Rural Electrification Administration and the extent to which such integrated resource planning is reflected in rates charged to customers.

"The report shall include an analysis prepared in conjunction with the Federal Trade Commission, of the competitive impact of implementation of energy conservation, energy

efficiency, and other demand side management programs by utilities on small businesses engaged in the design, sale, supply, installation, or servicing of similar energy conservation, energy efficiency, or other demand side management measures and whether any unfair, deceptive, or predatory acts exist, or are likely to exist, from implementation of such programs."

[For provisions requiring the report under section 111(e) of Pub.L. 102-486 to contain a survey of all State laws, regulations, practices, and policies under which State regulatory authorities implement the provisions of 15 U.S.C.A. § 3203(b)(3), (4), together with an analysis of the actual or likely competitive impact of energy conservation, energy efficiency and other demand side management programs by gas utilities on small businesses, see section 115(e) of Pub.L. 102-486, set out as a note under 15 U.S.C.A. § 3203.]

**Study Concerning Electric Rates of State Utility Agencies**

Pub.L. 95-617, Title VI, § 601, Nov. 9, 1978, 92 Stat. 3164, directed the Secretary to conduct a study concerning the effects of provisions of Federal law on rates established by State utility agencies and to submit a report to Congress on the results of such study not later than 1 year after Nov. 9, 1978.